## STATE v. SNYDER, TREASURER
### (No. 1058; Decided Feb. 15th, 1923; 212 Pac. 758)

SCHOOL LANDS—STATE FUNDS—SCHOOL LAND INCOME FUND—PER-
PETUAL SCHOOL FUND—STATUTORY CONSTRUCTION—STATE TREAS-
URER'S AUTHORITY TO QUESTION VALIDITY OF STATUTE—OIL LEASES
—RENTS—BONUSES—ROYALTIES—PROCEEDS REPRESENTING DEPLE-
TION OF SOIL.

1. The State Treasurer as custodian and conserver of State
   funds has a sufficient interest therein to question the
   validity of a statute under which it is sought by man-
   damus to compel him to pay out such funds.

2. Where the constitutionality of a statute is questioned in
   a court action and the court, after resorting to all proper
   lights and aids that it has a right to use in considering
   the question, is unable to determine in its own mind
   beyond a reasonable doubt that the law is unconstitution-
   al, such doubt must be resolved in favor of the validity
   of the law.

3. Constitution, Art. VII, Section 7, directing that the income
   arising from the perpetual school fund as defined by Sec-
   tion 6, preceding, which, together with all rents from un-
   sold school lands, shall be applied to the support of free

schools, when construed in connection with Section 8
directing its distribution, indicates an intention on the
part of the framers of the Constitution to create an in-
come fund for current needs,—the word "rents" as there
employed in interrelation with the word "income" mean-
ing proceeds from the ordinary use of land similar to that
of interest, or other income derived from a source which
is not itself depleted.

4.  The words "sale or lease" as used in Article VII, Section
2 of the State Constitution declaring that all moneys
arising from the sale or lease of school lands shall be
placed in a perpetual school fund, of which the annual in-
come only can be appropriated, when construed in con-
nection with other provisions of the Constitution on the
subject, manifests an intention sufficiently broad to in-
clude in the permanent school fund, the proceeds of any
lease arising from and representing the corpus of the
land, as distinguished from rents derived from the ordin-
ary use of land.

5.  Rules of interpretation or of definition as to the classifi-
cation, character or effect of documents as to the relation-
ship or rights of the parties thereto, do not control the
rights of beneficiaries under one side of such contracts
unless the rights of the latter be specifically provided for
in the instrument.

6.  Oil and gas while *in situ* are part of the realty and when
taken away the proceeds necessarily arise out of the cor-
pus of the land.   The character of such proceeds at least
as between beneficiaries, is not changed by the name,
nature or duration of the documentary authority under
which the oil or gas is removed, but must go to such bene-
ficiaries according to the rights existing between them.

7.  The plain intent of the State Constitution being that the
corpus of school lands shall be dedicated to the permanent
school fund, proceeds therefrom cannot be diverted to
other purposes by a mere subterfuge, designating as
rents, oil royalties realized in return for the privilege of
depleting the value of the land by a removal of its oil
or gas content.

8.  The perpetual school fund provided for by Art. VII, Sec-
tion 2 of the Constitution in its relation to school lands
occupies a position analogous to that of a remainderman
or reversioner owning the principal, the corpus of the
property, with the right to have it preserved and turned
over to him as nearly unimpaired as practicable, with the

incidental right to enjoin waste or the depletion of the property by the opening of new mines or oil and gas wells thereon during the life tenancy. The school land income fund provided for by the same article bears a relation analogous to that of a life tenant entitled to receive the income and rentals arising from the ordinary use of the property. Accordingly, the Land Board, as trustees for both funds, acting under legislative authority but not otherwise, may permit the opening and operation of new mines or oil and gas wells on school lands, receive and invest royalties therefrom to the credit of the permanent school fund and credit the interest earnings annually to the school land income fund.

9. While the Constitution provides that no sales of school lands shall be made except at public auction, no specific prohibition against the execution of public leases, without public auction, exists.

10. Chapters 66 and 147 L. 1921, in so far as they contemplate and direct the payment of royalties from mineral leases on school lands into the land income fund are in contravention of Article VII, Section 2, Constitution, and hence null and void.

Original proceedings in mandamus on the relation of School District No. 1 in the County of Weston, State of Wyoming, against A. D. Hoskins, as State Treasurer, to require him to credit to the account of the common school land income fund certain rents or royalties from the leasing of school lands and to continue to do so from time to time as such rents or royalties are received by him in the future. An alternative writ was granted and defendant made his answer and return alleging that the statute on which relator relied for relief was unconstitutional, to which answer and return relator filed a general demurrer and the cause was heard and determined upon the demurrer.

*Alfred H. Beach* and *Thurman W. Arnold.* for relator; *J. G. Hartwell, S. A. Nelson, Louis Kabell, Jr.,* and *L. H. Brown,* of counsel.

Defendant as State Treasurer cannot question the constitutionality of a statute by pleading that unless he does so, he will be personally liable. A ministerial officer is without

authority to question the constitutionality of a law. (Ry. Co. v. Worthen, 120 U. S. 97, 30 L. Ed. 558; Smith v. Indiana, 191 U. S. 138, 48 L. Ed. 125.) It is a function of the judicial department. Persons charged with the exercise of powers belonging to one coordinate department of government are not permitted to exercise powers belonging to either of the others. (Art. II, Sec. 1 Const.) A ministerial officer refusing to obey a statute on the ground of its alleged invalidity is attempting an exercise of judicial power. (Marbury v. Madison, 1 Cranch 127.) The State Treasurer would not incur personal liability in obeying the statute. (State v. Gramm, 7 Wyo. 329; U. S. v. Realty Co., 163 U. S. 427.) Courts will not consider questions with respect to the constitutionality of a statute unless it is necessary to a determination of the case. (6 R. C. L. 74.) The statutes relied upon by relator are constitutional. The lands involved were granted to the state by congress for the support of Wyoming schools (Sec. 4 Act of Admission.) Lands known to be mineral in character at the time of grant were excluded. (State v. U. S., 41 Sup. Ct. 393.) The Constitution created boards of land commissioners, (Art. XVIII, Secs. 3-4.) Proceeds from the sale of school lands constitute a permanent school fund (Secs. 5 Act of Admission.) School revenues include moneys arising from the sale or lease of school sections (Art. VII, Sec. 2 Const.) The income from permanent school funds together with leases of unsold school lands are available for support of free schools (Art. VII, Sec. 7.) Statutes providing for the sale or lease of state lands have been enacted from time to time, including re-leasing of mineral lands upon a royalty basis. The statutes directly involved in this controversy are Chapters 66 and 147 of the Laws of 1921. Leases of mineral lands provide for the payment of royalties which, in fact, are rents and not proceeds from a sale of the land. Such leases are for a definite term and no rights, similar to the respective rights of a life tenant or a remainderman, are involved, nor are the leases perpetual. They do not convey the mineral

content. The nature of the ownership of oil and gas has been fixed and defined in a multitude of decisions. (Walls v. Carb. Co., 254 U. S. 300; Ohio Oil Co. v. Ind., 177 U. S. 19; Brown v. Spillman, 155 U. S. 665.) Language may be found in some of the decisions indicating that no title exists as to oil and gas in place. An example is, Higgins F. Co. v. Oil Co., 125 La., 82 So. 206. Analyzing the cases on the subject we find that there are three views taken as to the nature of a land owner's right in the oil and gas: (a) that the land owner has no title to the oil and gas but a right to acquire it by reducing it to possession; (b) the land owner has a title to oil and gas qualified by the absence of a remedy against an adjoining owner taking it; and (c) that the surface owners have rights in common, of the same nature as the rights of percolating waters. It is impossible for the owner to sell any definite portion of the oil content of his land under either rule, as no property can pass until the property is ascertained. (Williston on Sales, 258; Sec. 4739 Wyo. C. S. 1910.) In De Moss v. Sample, 143 La. 243, it is held that oil and gas in the earth are not subject to ownership distinct from the soil. The Pennsylvania cases are collated and distinguished in Barnsdall v. Gas Co., 255 Pa. St. 338 where it was held that an instrument such as here involved is a lease. So much is apparent from the face of the instrument itself. (Meeks, v. Min. Co., 124 S. W. 1084; State v. Evans, 9 Ann. Cas. 520; State v. Association, 132 Inn. 232.) The state does not grant a lease of the character in question here until oil is discovered. The custom of granting mining leases has existed for centuries. (Coke Littl. 53 B.) A careful review of the authorities of every state in the Union demonstrates that a mineral lease is a lease in fact as well as in name, even where the lease deals with minerals which are a part of the land. (Osborne v. Oil & Gas Co., 103 Ar. 175; Kline v. Oil Co. (Cal.) 140 Pac. 1; Palmer Co. v. Woodard (Ga.) 75 S. E. 480; Chappel v. Foster, 123 Pac. 870; Beatty Co. v. Blanton (Ky.) 245 Fed. 979; Coal Co. v. Peers, 150 Ill. 344; Haywood v. Fulmer

(Ind.) 18 L. R. A. 491; Lacey v. Newcomb, 63 N. W. 704; Harlow v. Iron Co., 36 Mich. 113; Diamond Co. v. Min. Co., 70 Minn. 500; Austin v. Min. Co., 72 Mo. 535; Pelton v. Min. Co., (Mont.) 28 Pac. 310; Genet v. Co., 136 N. Y. 593; Woodland Co. v. Crawford, (Ohio) 34 L. R. A. 62, 44 N. E. 1093; Stinson v. Hardy, 27 Ore. 584; State v. Welch, 184 Pac. 786 (Okla.); Caldwell v. Fulton, 31 Pa. St. 475 and other cases cited; Young v. Ellis, (Va.) 21 S. E. 480; Carter v. Tyler (W. Va.) 43 L. R. A. 725; Gillette v. Treganza, 6 Wis. 343; U. S. v. Gratiot, 14 Peters 526.) The English and Canadian cases support the same principal. The right to open and exhaust new mines is, in the absence of mines already open, implied from the lease of lands for mining purposes generally. (Traer v. Fowler (C. C. A.) 144 Fed. 810.) A mineral lease for a term of years is either a lease of the land or a lease of that incorporeal hereditament in the land, known to the law as a profit *a prendre,* and is in no event a sale of the land or a conveyance of the real estate. (Tiffany on Real Property Vol. 2 p 1308; Smith v. Simons, 1 Root (Conn.) 318.) Easements or profits *a prendre* may be held for life in fee or for years. (Huff v. McCauley, 53 Pa. St. 206; Mayor v. Mabie, 13 N. Y. 151; State v. Welch (Okla.) 184 Pac. 786; Beardsley v. Kansas Gas Co., 96 Pac. 859.) An instrument granting all of the minerals is a conveyance of real estate. (Davis v. Texas Oil Co., 232 S. W. 550; Oil Co. v. Emerson, 298 Ill. 394, 131 N. E. 645.)

The state is estopped from confusing rights acquired by lease, by calling them sales. (U. S. v. Williamette Co., 54 Fed. 811.) State officials are estopped to deny the interpretation which representatives of the people have placed upon the Constitution for more than a quarter of a century. (Coloma v. Eaves, 92 N. E. 484 and cases cited.) There being no provision for a disposal of state lands except by sale or lease, the suggestion that the instrument in question is an operating agreement is untenable. (State v. Board, 20 Wyo. 162; Ch. 58 C. S. 1920.)

In the interpretation of statutes, words in common use are to be construed in their natural, plain, ordinary signification, (Neilson v. Alberta, 129 Pac. 847; Lake County v. Rollins, 130 U. S. 662, 32 L. Ed. 1060,) except where they have acquired a technical meaning, (Endlich Int. Stat. 1st Ed. Sec. 2.)   The terms "dispose of," "lease" and "sale" have a common meaning, and as such, are used in Section 5 of the Act of Admission.   The term "dispose of" authorizes a mineral lease.   (U. S. v. Gratiot, 14 Pet. 526.)   Under the Federal Leasing Act of February 25th, 1920, the power to lease state granted lands is not restricted to agricultural lands; lands not known to be mineral in character on the date of the grant are not affected by subsequent discovery of mineral thereon.   (Abraham v. Miner, 9 L. Ed. 408; Wyo. v. U. S., Adv. Op. 12 p. 453.)   The state legislature is authorized to enact necessary laws for the leasing of all lands granted to the state (Art. XVIII, Sec. 4.)   The term "rental" includes the term "royalty" since royalties are, in fact, rentals.   (Atty. Gen. v. Mercer, 8 App. Cas. (Eng.) 767; U. S. v. Gratiot supra; Lehigh etc. Co. v. Bamfortd, 150 U. S. 665; Reynolds v. Hanna, 55 Fed. 800; Kissick v. Bolton, 134 Ia. 650; Meek v. Co. 124 S. W. 1089; 78 Am. & Eng. L. 2nd Ed., 782.)   "Royalty" is another term for "rent" but is limited to rents due for the right or privilege of taking mineral or oil and gas out of designated land. (2 Thornton Oil & Gas, 387, Sec. 253 and cases cited; Taylor L. and T. 9th Ed. 369; Campbell v. Lynch (W. Va.) 94 S. E. 739; State v. Association, 132 Minn. 232.)   The Constitution requires rentals from the lease of school lands to be placed in the school land income fund, to be used for current expenses of schools.   The provisions of the Constitution on the subject were adopted from Nebraska with a construction by the Supreme Court of that state in State v. McBride, 5 Nebr. 102 to the effect that rents from leases are incomes to be used for the support of schools.   The construction is decisive of the question here.   (Crumrine v. Reynolds, 13 Wyo. 111; Cooley's Const. Lim., 7th Ed. 85;

Tyler v. Tyler, 19 Ill. 155.) There is no conflict in the two provisions of the Constitution. The words "moneys derived from the sale or lease of Sections 16 and 36, etc." meant moneys arising from the sale of leases by way of bonus and not money paid as rents or royalty under leases. Contemporaneous legislative construction of the provisions referred to is found in Section 29, Ch. 79 Laws 1890-91, directing all interest on purchase money and all rent received from lands leased, to be credited to the income fund to which the land belonged. Also Chapter 79, Sec. 22 of the same session, requiring leases to be made in a manner that would secure the greatest revenue to the state, and Section 33, directing sales and leases to be held at the door of the court house of the county. The same apparent conflict is found in Section 47 of the same Chapter, directing funds from the sale or lease of state lands to be held intact for the benefit of the funds for which lands are granted, and interest thereon to be expended for the purpose of the grant, clearly indicating an intention that moneys arising from a lease are moneys which arise by way of bonus from the sale of the lease and not moneys which arise under terms and conditions of the lease; "rentals" on the other hand, being intended to mean moneys which arise under the terms and conditions of the lease itself. A distinction between bonus and rentals or royalties, is found in the oil and gas leasing act passed by congress. Chapter 147 L. 1921 must govern since it repeals Chapter 66 passed at the same session. Legislative construction and the contemporaneous and practical construction acquiesced in by the people for many years, and the same policy of other states expressed by their Constitutions adopted before ours, sustain the contentions of plaintiff. (Black's Const. Law, p. 66; 12 C. J. 713; Martin v. Hunter's lessee, 1 Wheat, 304; Cohen v. Virginia, 6 Wheat, 264; Bank v. Halstead, 10 Wheat. 51; Ogden v. Saunders, 12 Wheat. 290; Mines v. Happersett, 21 Wall. 162.) The construction evidenced by the opinions of two attorneys general of the state is to the same effect. (Atty. Gen. Rep. 1890-1892

p. 102.)  The people of the state have acquiesced in this construction for more than twenty-eight years.  Arizona Constitution Art. X, Sec. 4 provides for proceeds from timber sales to go to the income fund.  California, Art. IX, Sec. 4, directs rentals to go to income fund, and in Idaho royalties are treated as income.  Iowa, Art. IX, Sec. 3, rentals are income; Kansas, Art. VI, Sec. 3, the same; Michigan, Art. XI, Sec. 11, the same; Montana, Art. XI, Sec. 2, the same, except royalties from coal go to permanent fund; New Mexico, Art. XII, Sec. 4, directs rentals to go to income fund, including royalty; Oklahoma, Art. XI, Sec. 3 directs rentals to go to income; Oregon, Art. VIII, Sec. 2, the same; Wisconsin, Art. X, Sec. 2, the same; Washington, Art. X, Sec. 3, the same; South Dakota, Art. VIII, Sec. 2, the same; Ohio, Art. VI, Sec. 1, the same; Minnesota, Art. VIII, Sec. 2, the same; Utah, Art. XI, Sec. 6 directs the proceeds from the sale of timber, mineral or other properties to a perpetual fund.

Unconstitutionality of a statute must appear beyond reasonable doubt in order to invalidate it.  The question is one of much delicacy.  (Marbury v. Madison, supra; Fletcher v. Peck, 6 Cranch 87.)  The presumption of constitutionality attaches and is to be decided in favor of the law in a doubtful case.  (Knox v. Lee, 12 Wall. 457.)  A mere doubt is insufficient to overcome the presumption of validity.  The question of policy is for the legislature.  (Erie etc. Ry. Co. v. Casey, 26 Pa. 287; Sharpless v. City, 21 Pa. 147.)  These cases are classics in American jurisprudence.

*W. L. Walls,* Attorney General, for defendant; *John W. Lacey* and *N. E. Corthell, amici curiae,* in support of defendant's position.

Chapter 147 Laws 1921 is an amendment of former statutes relating to the disposition of school funds.  Chapter 66, Laws 1921 relates to the disposition of rentals from school lands.  The State Treasurer has unquestioned authority to challenge the validity of a statute to the extent, at least, of seeking advice or judicial interpretation thereof.

The case of State v. Gramm cited by relator is not in point, for the reason that it involved an interpretation of a statute different from our present statute on the subject, Sec. 321 C. S. 1920, under which the State Treasurer seems to be an insurer of state funds and responsible for the wrongful disbursement thereof. (Norton v. Shelby Co., 118 U. S. 425; Woolsey v. Dodge, 6 McLean 142; Yale College v. Sawyer, 62 Fed. 176; L. R. & R. Co. v. Worthem, 46 Ark. 312; 23 A. and E. Enc. L. 2nd Ed. 369; Huckfeldt v. Board, 20 Wyo. 162.) He may therefore question the validity of a statute. (State v. Candland, 36 Utah 406; Van Horn v. State, 46 Nebr. 62; State v. Calusen, 117 Nebr. 1103; Stockmen v. Leddy, 23 Colo. 300; Comm. v. Treas. 13 P. D. R. 231.) Chapters 66 and 147 L. 1921 are not in conflict as they relate to different subjects. Relator seeks to divert certain money to the common school land income fund by the medium of Chapter 66 and also seeks to have the same distributed to schools by the medium of Chapter 147. It, therefore, seems inconsistent that relator should contend that Chapter 66 was repealed by Chapter 147. Defendant contends that both chapters are in conflict with the provisions of Sections 2, 3 and 7 of Article VII of the Constitution. The permanent state school fund is defined by the Constitution with limitations upon its investment. The interest from such investments and the rents from unsold school lands belong to the income fund, which is to be distributed annually for current needs of the schools. The legislature has from the beginning sought to effectuate the provisions of the Constitution relating to these funds. There is no warrant for the inclusion of, what are called bonuses or royalties arising in connection with mineral leases, in the income fund. Both terms are defined by the authorities as something different from rent. Bonuses and royalties should go to the permanent fund. All proceeds from lands granted to the state for schools, except the interest on the permanent fund, and the rents of unsold school lands, are, under Section 2 of Art. VII, a part of the permanent school

fund. There is legislative authority for the granting of mineral leases, (716-719 C. S. 1920.) Under this statute mineral leases are clearly distinguished from ordinary surface, grazing or agricultural leases and provide for a royalty based on production. Chapter 147 Laws 1921, relating as it does to the manner of distributing school funds, is not directly involved in this controversy; the point at issue here is to determine whether oil royalties belong to the permanent fund or to the income fund, a solution of which question was attempted by the legislature in the enactment of Chapter 66, Laws 1921. The mineral statute provides for a flat minimum annual rent and also for royalty payments on production, the flat minimum payment being credited to the royalty charge of each year. Stress is laid upon the character of the instrument as indicating whether the returns therefrom are royalties or rents, in face of the fact that the legislature distinguished royalties from rents. The argument that unascertained goods connot be made the subject of sale and hence the royalties received must be considered rentals, may by the same course of reasoning be construed to mean that unascertained goods cannot be made the subject of lease. The statute as well as the decisions on the subject distinguish royalties from rents. A summarized definition of rents, gained from authorities, is that it is a payment or return derived from the ordinary use of land and the term occupies a fixed place in the law of landlord and tenant. (Standard Dic.; Webster Int. Dic.; Bouvier; 2 Blackstone Com. 41.) Royalties received from mineral leases are a part of the real estate. (Palms v. Palms (Mich.) 36 N. W. 419; Fairchild v. Fairchild (Pa.) 9 Atl. 255; Von Baumbach v. Sargent Co., 219 Fed. 31.) Rent is to be distinguished from royalty. It is something paid for the use of land. (In re Roth & Appel, 181 Fed. 667; Brooks v. Cook, 141 Ala. 499; Kendall v. Uland, 120 N. W. 152; Appeal of Duff 14 Atl. 364.) A mineral lease authorizing the removal of coal, oil or gas, is a conveyance of a part of the property. (Lawson v. Kirchner, 50 W. Va.

344; Blakley v. Marshall, 174 Pa. 425; Hopes Appeal, 3
Atl. 23; Wilson v. Youst, 43 W. Va. 826.)   Care must be
taken to distinguish between rent and royalty in connection
with gas and oil leases.   Rent is the term applied to the
privilege given to bore for gas and oil.   Royalty is a percent-
age of the oil after it is found.   (Thornton Oil & Gas, 3rd
Ed. Vol. 1, p. 387.)   Petroleum, oil and natural gas are
minerals and a part of the land.   (Isam v. Rex Crude Oil
Co., 147 Cal. 659, 82 Pac. 317; Hughes v. U. S. Pipe Line,
119 N. Y. 423; Poe v. Ulrey, 233 Ill. 56, 84 N. E. 46; Lan-
yon Zinc Co. v. Freeman, 68 Kan. 691, 75 Pac. 995; Detler
v. Holland, 57 Ohio St. 492, 49 N. E. 690; Buffield v. Hue,
136 Pa. 602; Murray v. Allred, 100 Tenn. 100; Free v.
Davis, 52 W. Va. 1, 43 S. E. 164; Preston v. White, 57 W.
Va. 278; Blakley v. Marshall, 174 Pa. 425, 34 Atl. 564.)
Royalty is a sum paid to the lessor of a mine.   (24 Am. &
Eng. Enc. L. p. 1009.)   It is analogous to but not synono-
mous with the term rent; it is recompense for parting with
the title to a thing of value, the selling price of it.   Royal-
ties are a part of the land.   (Blakley v. Marshall, 174 Pac.
425; Eakin v. Hawkins, 52 W. Va. 124, 43 S. E. 211; Wil-
son v. Youst, 43 W. Va. 826, 28 S. E. 781; Stewart v. Ten-
nant, 52 W. Va. 559, 44 S. E. 223; Barnes v. Keys, 36 Okla.
6, 127 Pac. 261.)   In a construction of law every part of it
must be viewed in connection with the whole, and harmon-
ize, if possible.   (I Kent. 462; Potters Stats. & Const. 654;
Lewis Southerland Stat. Con. 2nd Ed. 516, p. 54, 7 Wyo.
129.)   And this applies to the Constitution.   (People v.
May, 3 Mich. 598; People v. O'Donnal, 202 N. Y. 313; Peo-
ple v. Ahearn, 196 N. Y. 221.)   Every word, clause and
sentence must be given effect.   (Rhode v. Murfin, 168 Mich.
685; Dennis v. Moses, 18 Wash. 537, 52 Pac. 333.)   The
meaning of words is controlled by the context.   (Cherokee
Nation v. Georgia, 30 U. S. 1; Fitzgerald v. Cleveland, 88
Ohio St. 386; Ex parte Whitehouse, 104 Pac. 272.)   The
same words appearing in different parts of the same in-
strument do not necessarily mean the same thing.   (New

etc. Co. v. Copper Co., 91 U. S. 656; Trust Co. v. Mercer
Co., 170 U. S. 583; Upshur v. Mayor, 94 Md. 757, 51 Atl.
953; Rockefeller v. O'Brien, 224 Fed. 541; State v. Earn-
hardt, 170 N. C. 727; Murphy v. Utter, 186 U. S. 95.)   The
intent of a statute is the law Sutherland Stat. Con. 363.
A statute is to be construed with reference to its manifest
object.   (Hall v. State, 137 S. W. 500; Cincinnati v. Conner,
44 N. E. 582.)   Definitions of rent are inconsistent with
the character of the contract known as a mineral lease.   (U.
S. v. Ervien, 246 Fed. 277; Ervien v. U. S., 251 U. S. 41;
Riley v. Kelsey, 218 Fed. 391; Parker v. Riley, 243 Fed.
52.)   If the term "rents" be construed as to take the pro-
ceeds derived from the extraction of oil from the land such
construction will put Sec. 6, Art. VII out of harmony with
all statutory provisions above quoted.   (State v. McBride,
5 Nebr. 102.)   It is readily distinguished from the fore-
going authorities, since it involves the question of disposi-
tion of moneys paid into the treasury as rent, the sole ques-
tion here is the disposition of proceeds from school lands
granted by congress to the state; a trust was impressed up-
on the proceeds of such lands creating a permanent school
fund.   (Section 5, Act of Admission.)   The Constitution,
Art. XVIII, Sec. 2 confirms this trust which was recognized
in State v. Board, 20 Wyo. 162, and a breach of said trust
will be enjoined at the suit of the United States.   (U. S.
v. Ervien, supra.)   The voluminous brief of relator does
not treat directly of the extent of the state's power to dis-
pose of the subject of the grant, nor its limitations; it deals
with definitions and the rights of parties to mineral leases,
with the relations under various forms of contract freely
made without limitation, etc.   In Riley v. Kelsey, 218 Fed.
391, the U. S. District Court of Oklahoma held that the tak-
ing of oil under the lease affects the sale of that portion of
the land represented by the oil and each of the heirs is en-
titled to his share of the proceeds.   In the case of Parker
v. Riley, 243 Fed. 42, it was held that a mineral lease was
an alienation of that part of the land which the lessee takes

from it. Minerals are a part of the homestead. (Parker v. Riley, 250 U. S. 66.) It is the opinion of respondent that the answer and return on order to show cause is good and that adequate cause is shown why respondent should not be compelled to do what his answer and return, and his brief conclusively shows would be unlawful.

*A. H. Beach* and *Thurman W. Arnold,* in reply.

A statute should not be held unconstitutional unless its conflict with the Constitution is palpable and beyond all doubt. (Sutherland Const. 83; Black's Const. Law, 33; 12 C. J. 702, 793.) The United States Supreme Court has held that royalties are not proceeds from the sale of land. (Von Baumback v. Sargent Co., 242 U. S. 509.) The State Treasurer has refused to obey the solemn act of the legislature which is unwarranted unless by so doing he makes himself personally liable. It is possible to sell all of the mineral beneath a tract of land but impossible to sell an undetermined part of that undetermined quantity. The cases cited by respondent, defining the respective rights of life tenants and remaindermen, all of which are grouped in a note in 26 L. R. A. 614, have no relation to the question as to whether the land is a lease or the mineral sold outright, because the general rule applies in each case. The rule in the case of Von Baumback v. Sargent Co., 219 Fed. 31 that royalties from mineral leases which demised all of the iron under the surface constitutes a sale of the land itself and are not taxable as income, does not hold that a lease for a term of years is a sale. Even in that case Judge Sanborn observed that it is more difficult to draw a line of demarcation between rents and profits in the corpus of property of this nature than it is to separate rents and profits of a farm, tenement or office building from the property itself. And other portions of the opinion clearly exempt a case like the one at bar. Moreover, the case was reversed by the United States Supreme Court,—Von Baumback v. Sargent Land Co., 242 U. S. 542--it being held that royalties from min-

eral lands are rent and not profits from the sale of the cor-
pus of the land; and further, that the case of State v. Evans
was not a special property rule in Minnesota but the law
everywhere.

BLUME, Justice.

This is an action in mandamus brought in this court by
the State on relation of School District No. 1 of Weston
County against the Treasurer of the State of Wyoming.
The present State Treasurer has been substituted as party
defendant. Issues have been properly joined. It is not
necessary to make a lengthy statement of the facts. The
State, pursuant to legislative authority, has heretofore en-
tered into certain agreements with other parties, denominat-
ed as "oil and gas operating leases," leasing unto the par-
ties of the second part certain school lands for the purpose
of drilling, boring, operating for and producing therefrom
mineral oil and gas, with the right and privilege of using
·o much of the surface of said land as may be necessary in
connection with said work. The leases are for five years,
and provide for an annual rental as well as certain royal-
ties on the oil and gas produced. The legislature, by Chap-
ter 66, Session Laws 1921, provided that one-third of the
rents and royalties, and bonuses, received from these leases
should be credited to the land income fund, two-thirds to
the permanent school fund, but that from and after two
years from the passage of the act, all of it should be credit-
ed to the said permanent fund. By Chapter 147 of the same
Session Laws, which is but an amendment of Section 144 of
the Wyoming Compiled Statutes of 1920, the legislature
provided for the distribution of the income fund, includ-
ing the rents of unsold school land. Relator contends that
the provisions of Chapter 147, supra, govern in this case,
because, being a later law than Chapter 66, supra, repeals
the latter by implication; that accordingly all the royalties
should be turned into the land income fund. Under the
view we take of this case, it is unnecessary to determine

whether one or the other of the acts controls. The gist of the controversy herein is whether, under our constitution and the land grant from the United States, the royalties from mineral leases should go into the land income fund—herein, for the sake of simplicity, called the income fund—to be distributed to the various counties in the state as the fund accumulates, or whether they should go into the permanent school fund, the income of which only may be used. Hence we must decide as to whether or not the legislative acts, insofar as they direct these funds to be turned into the income fund, are in conflict with our Constitution.

The case has been well presented and argued by able and learned counsel on both sides. The royalties from oil and gas leases have of late been coming into the state treasury in ever increasing amounts, so much so that the legislature, bearing in mind the economic stringency then existing, and desirous of fostering the betterment of the schools of the state, deemed it best that at least a portion thereof should be applied to the current needs thereof. Mention was made in the oral argument that an attempt had been made to pilfer from and rob the permanent fund. No such intention, of course, could be attributed to the legislature. On account of the apparent conflict hereinafter referred to, existing in our constitution, it is no surprise that men should have differences of opinion on the subject, and we have not the slightest doubt that the members of the legislature, in passing the laws mentioned, were actuated by the highest and most honorable motives, particularly in view of the fact that the permanent as well as the income fund both are destined for the ultimate benefit of the schools of the state.

We think, in the first place, that the Treasurer of the state, as custodian and conserver of the funds, has sufficient interest therein so as to raise the question whether or not the legislative acts in question are in conflict with the Constitution, in an action in mandamus where it is sought to compel him to pay out the said funds or a portion thereof. (Van Horn v. State, 46 Nebr. 62; State ex rel v. Claussen,

65 Wash. 156, 117 Pac. 1103; Stockman v. Leddy, 55 Colo. 24, 129 Pac. 221 and cases therein cited. Note to 24 L. R. A. N. S. 1260. Com. ex rel. v. Attorney General, 13 Pa. Dist. 231.) Hence we shall pass to the main question of the case above mentioned. In so doing we must bear in mind that unless it clearly appears that an act of the legislature is in conflict with the Constitution, it must be upheld, and that all doubts are resolved in favor of the constitutionality of the act. This, however, does not mean that we are not permitted to resort to all proper lights to determine that fact, nor does it mean the doubt other than that which arises in the mind of the court. In the case of C. & O. R'y. Co. v. Miller, 19 W. Va. 408, 421, the court said:

"But when doubts do arise in the minds of the court as to the interpretation to be put upon a provision of a constitution, if after a careful examination of the provision, and after all the lights, to which it is proper to resort, have been made use of for the purpose of ascertaining its true meaning, the court construing the provision still has doubts whether the legislation complained of is an infraction of the instrument, the court upon such doubts alone is bound to pronounce in favor of the validity of the act. The court does not, in such case, sustain the validity of the act, because other persons or courts have doubted its constitutionality, but because the court itself, after using all the aids that it has a right to use, in its own mind, acting for itself and upon its own responsibility, is not able to say beyond a reasonable doubt that the act is unconstitutional."

By Section 4 of the Act of Admission there was granted to this state for the support of the common schools all of Sections 16 and 36, or lands selected in lieu thereof. Section 13 of the same act provides that mineral lands are excluded from the grant. Section 5 of the act provides:

"That all lands herein granted for educational purposes shall be disposed of only at public sale, the proceeds to constitute a permanent school fnud, the interest of which only shall be expended in support of said schools. But said lands

may, under such regulations as the legislature shall prescribe, be leased for periods of not more than five years, in quantities not exceeding one section to any one person or company.''

Section 2 of Article 7 of the State Constitution in part provides:

''The following are declared to be perpetual funds for school purposes, of which the annual income only can be appropriated, to-wit:  *  *  *  all moneys arising from the sale or *lease* of sections number sixteen and thirty-six in each township in the state, and the lands selected or that may be selected in lieu thereof.'' etc.

If this provision stood alone in the Constitution, and were not modified or explained by any other provisions therein, the intention would be plain and clear, and in such event the receipts from all leases, as well as from all sales of the lands in question, would belong, beyond the peradventure of a doubt, to the permanent and not the income fund.

Relator relies on the provisions of Section 7 of the same article, which provides for the income fund, and is as follows:

''The *income* arising from the funds mentioned in the preceding section, together with all the *rents* of the unsold school lands, and such other means as the legislature may provide, shall be exclusively applied to the support of free schools in every county of the state.''

It is the contention of relator that all the proceeds of the leases in question are ''rents'' within the meaning of the latter section, and that hence the proceeds, including mineral royalties, at least when directed by the legislature, must go into the income fund and be distributed as directed by Section 8 of Article 7 of the Constitution. We need not determine, as to whether or not, should we sustain this contention, the proceeds would automatically go into the income fund, but it is clear that in such event the legislature could at least direct all of the proceeds to go there, and

would not at all be limited to the percentage mentioned in Chapter 66 of the Session Laws of 1921. Respondent, on the other hand, contends that under the direct provision of Section 2, supra, all moneys arising from the leases as well as sales of school lands go into the permanent fund. There is, apparently, a conflict in the two sections, arising from the fact that proceeds of leases are commonly called rents. We must, therefore, give a careful consideration to the language, intent and purpose of the two sections, and find out their real meaning, and endeavor, if we can, to discover whether there is a real conflict, or whether the two sections may stand together harmoniously.

It is apparent that Section 7, supra, construed in connection with Section 8 following, deals with the land income fund, a fund that subserves current needs, and is to be distributed from time to time as provided by Section 8. Sec. 2, supra, on the other hand, deals with the permanent fund. Sec. 6 of the same article, provides that the permanent fund shall remain inviolate and shall be invested only in certain securities. Hence, it would seem that the "income" mentioned in said Section 7 consists mainly, if not entirely, of interest on the fund mentioned in the preceding section; it is revenue derived from a source which is not itself depleted. The term "rent" is used in the same section; it is placed, as it were, in interrelation with "income," and seems to deal with proceeds similar to that of interest, namely, those derived from a source which is not itself depleted. This idea seems to be indicated more clearly in Section 8 following, which provides for the distribution of the money mentioned in said Section 7, and reads, in part, as follows:

"Provision shall be made by general law for the equitable distribution of such *income,* etc."

We think it is clear that the word "income" as used in Section 8 includes both the income as well as the rental mentioned in Section 7; but using the one term only, seemingly treats the income and rental mentioned in said Section 7 of the same or similar character, both derived from

a source which is not itself depleted. The proceeds of leases are, of course, rents, since that is the name commonly given them; but they may be the compensation for the ordinary use of property, and then they may be called ordinary rent. Again, the proceeds may arise from and represent the corpus of the land; but no suitable terminology has been devised to distinguish them from ordinary rent. In Minner v. Minner, 84 W. Va. 679, 100 S. E. 509, 511, for instance, royalties and rental are mentioned as being a part of the corpus of the land. No distinction would ordinarily need to be drawn between the two kinds of rent. That is necessary only when the dispute, as here, exists as to the ownership thereof. Section 2, supra, provides that the proceeds of leases shall belong to the permanent fund. When Section 7, supra, provides that rent shall go into the income fund, it at least to that extent modifies Section 2. And it would seem clear, that in order that both provisions may stand, the term ''rent,'' as used in Section 7, must have been intended to refer only to ordinary rent, namely, the compensation for the ordinary use of the lands, and did not contemplate that it would include that arising from use not ordinary but proceeding from the corpus of the land. Nothing is said in the section to indicate that the term was applied to compensation other than that for the ordinary use of land. In 1892, inquiry was made of the then attorney general of the state, now chief justice of this court, as to which fund had the right to the rentals of state lands, including the school sections, at which time the only rentals coming to the state were from leases of agricultural or grazing lands. Giving effect to the provision of Section 7, he held that they should be turned into the income fund, and in this followed the case of State of Nebraska ex rel v. McBride, 5 Nebr. 102. In so doing he was obviously right. The rents then involved clearly arose from the ordinary use of lands, and hence, in order to give proper effect to the provisions of Section 7, they were rightly held to belong to the income fund. So, too, the rental paid for the occupancy

of the land under mineral leases undoubtedly belong to the same fund, and hence all school lands in the state, worthy of occupancy at all, contribute directly to some extent to this fund. But the opening up of new mines, as we shall hereafter show more fully, is not generally an ordinary use, and hence the rents under leases therefor, derived from the corpus, are a different kind of rent than that contemplated in Section 7, supra.

Section 2, supra, of the Constitution, on the other hand, deals with a fund that is intended to be permanent. The grant under Sections 4 and 5 of the Act of Admission, or the patents issued pursuant thereto, give the land itself, the whole and every part of it, without exceptions. Whatever was part and parcel of the land passed thereby as the origin and source of the permanent fund. True, mineral leases may not have at all been thought about when the Constitution was adopted, but the language is broad enough so as to require the proceeds of leases arising from the corpus of the land to be put into the permanent fund. Some consideration, by some one or more, was given to the subject, it appearing on the printed copy of the substitute for files 59, 28 and 8 of the Constitutional convention, that the words "or leases" are enclosed by pencil marks. The whole section, as well as Section 7, was evidently taken from the Constitution of the State of Nebraska. It is not likely that Constitutional conventions of both states adopted the provisions thoughtlessly. In any event, the provision was left in, and we must give it full consideration insofar as it does not conflict with a later provision. Every word used in Section 2, supra, of the Constitution, unless it be the word "lease," is used for the purpose of effectuating a permanent fund. We do not think that the one word is an exception. As we believe that the words "income" and "rent" as used in Section 7 are closely related, so we believe that the words "sale" and "lease" as used in Section 2 are also closely related, both used for the purpose of effecting a similar purpose, namely, the disposal of part of the corpus of the land.

Hence the proceeds of any lease which arise from and represent the corpus must go into the permanent fund. In fact, the broad intention is manifest in this and other sections of the Constitution that the permanent fund shall remain inviolate, and we should not give too narrow a construction to the methods and means by which that is designed to be accomplished. Counsel for relator say that the provision relating to leases in Section 2 refers to bonuses received therefrom. But the language used does not seem to bear such interpretation. But let us consider the suggestion. Bonuses might conceivably arise in two ways. Suppose that the state should let 100,000 acres of agricultural lands, for an aggregate rental of, say, $10,000, making a rental of ten cents per acre, and suppose further, that at the time a bonus is offered of an additional $10,000.00. It must be perfectly clear that to call the latter sum a bonus would be a misnomer. The real rental would be $20,000.00, or 20 cents per acre, and hence the whole of it would go into the income fund. Or again; suppose that the state should have agricultural leases with an aggregate rental of $10,000, and should sell the leases for $11,000.00. While such a sale is hardly conceivable in the field of economics, still let us assume with counsel that such a state of facts might arise. Counsel say that the excess of $1000.00 would be a bonus, to be turned into the permanent fund. It is, however, clear that the amount would simply in effect be an increased rental, none of which could be diverted from the income fund. Hence the explanation offered is altogether inadequate. As before stated, if we can, we should give full force and effect to the provision that the proceeds of leases contemplated in Section 2, supra, shall go into the permanent fund, while at the same time permitting "rent" contemplated in Section 7, to go into the income fund. We cannot do so, if all the proceeds of leases are necessarily ordinary rent, as used in Section 7; but we can do so, if these proceeds may, representing the principal, the corpus of the property, be different from ordinary rent. The constitution-

al provisions mentioned compel, and the authorities permit, such distinction. In fact, we can find no cases where the proceeds of mineral leases, under circumstances such as exist in the case at bar, have been treated as ordinary rental in the sense contended for, and the authorities are numerous—extending as far back into the centuries of the past of Anglo-Saxon jurisprudence as the lights available permit us to search and find—and are unanimous in holding that the proceeds arising therefrom under facts similar to those in the case at bar, are and must be treated as principal. We shall treat of these cases somewhat later.

We fear that relator has laid too much stress upon mere terminology, used in cases that have no application here. Thus a great many cases involving mineral leases have been cited by relator in which the proceeds therefrom have been called rent. Some of these cases involve the construction of the instrument under which the mining was done or intended to be done, such, for instance, as to whether the grantee therein had a mere license or a better title; others relate to the right of the state to interfere and regulate the flow of oil or gas or the drilling for it; others to the question of taxes; others as to whether or not a mechanic's lien could be filed against a mine under lease; others, as to whether the grantor, being at least by analogy the landlord, could have a landlord's lien. None of these cases have any bearing here; none of them required determination as to what kind of rent was involved. It becomes, of course, often quite important to determine the effect of the written agreement between parties. In the case of Genet v. Delaware & Hudson Co., 136 N. Y. 953, for instance, an action was brought for damages for negligently destroying a mine. The defendant claimed that under the document under which it operated the mines it became the owner of the coal; and hence was not liable for damage. The court, however, held that the lease was not a conveyance; that the compensation to be paid was rental, and that the company was liable for negligent operation. So in Austin v. The Hunt-

ville Coal & M. Co., 72 Mo. 535, plaintiff had given a lease to a third party to mine coal under his property. The lessee never operated a mine. Subsequently the defendant entered upon plaintiff's premises and took therefrom a great amount of coal, settled with the lessee in the lease above mentioned and claimed that since this lessee owned all the coal in the land, it was not liable to plaintiff, who sued for the value of the coal taken. The court held that the lease did not constitute a sale of the coal, but the compensation to be paid was rental. These decisions are right, but have no bearing on the case at bar. They are but an illustration of many of the cases upon which relator relies, and it would appear clearly dangerous to attempt to settle the principles of law involved in the case at bar by definitions of sales, leases and rents given in such cases as these. We are cited to Von Baumbach v. Sargent Land Co., 242 U. S. 509, which holds that royalties received from mining are "income" within the meaning of the Income Tax law. Whatever we may think of the decision, we must bear in mind that the intent of that law is to tax profits, and these may arise from the disposal of the principal, as well as in other ways. Besides, the court in the foregoing case clearly recognizes the fact that the taking of the minerals from the land depletes the corpus of the property. This decision in no way affects,or attempts to adjudicate, the rights of two different parties, or funds entitled to these royalties. A great many cases are cited defining the term "royalty," and declaring it to be "rent," "in the nature of rent," or "analagous to rent." Not one of these cases deals with the subject under·consideration here. Most of the cited cases are from Iowa, Illinois, Missouri, Pennsylvania and West Virginia. Yet in each one of these states, as will be hereafter shown, the courts have held specifically, and without leaving any doubt on the proposition, that under circumstances similar to those in the case at bar, royalty on mineral leases is a part of the corpus of the property, and that the principal of the royalty belongs to the party entitled to the corpus

—the permanent fund, and in no event more than the interest thereon belongs to the party who is entitled to the income therefrom.

A fundamental fact seems to have been quite overlooked. A document may have a certain, definite effect as between the parties thereto and may determine the relationship and rights existing between them. But we are not at all concerned here with a subject of that kind. We are dealing here with only one side of the contract, the side that receives or is entitled to the royalty and rent, and the dispute exists only between the two beneficiaries on that one side —the permanent fund and the income fund. If a trustee, with power, acting for two beneficiaries, makes a lease or any other contract with a third party, this lease or contract will not at all effect the relationship or rights of the beneficiaries as between themselves, unless, of course, these rights are—in accordance with the true facts,—specifically provided for, which is not done in this case. Hence the rights of the beneficiaries as between themselves must be sought for outside of the provisions of the leases involved in the case at bar. This must be clear. Oil and gas, while in *situ,* are part of the realty, part of the corpus of the land. When a portion of it is taken away, the proceeds necessarily arise out of the corpus, and it is humanly impossible to change that simple, plain, physical fact. The character of the proceeds can, obviously, at least as between the beneficiaries, in no possible manner be changed by the nature of the documentary authority pursuant to which the oil and gas is taken out of the ground. Documents do not possess the power of an alchemist, neither do they wield a magician's wand. Whether the oil be taken out of the ground pursuant to a license, lease, sale or any other grant, or without any authority whatever, could not in the slightest degree affect the physical fact that it comes from the corpus of the land. If taken and disposed of at all, the effect is clearly a permanent disposition of that much of the corpus, the principal of the land, and irrespective of the authority

pursuant to which that is done, the proceeds must go to the beneficiaries according to the rights existing between them —in this case to the permanent fund to which according to the intention of the constitution, the corpus of the property is dedicated, and we can by no subterfuge take it therefrom by simply saying that royalties are rents. (See Appeal of Stoughton, 88 Pa. St. 198; Parker v. Riley, 243 Fed. 42.) Nor could it make any difference whether the documentary authority pursuant to which the mineral is taken is limited in duration or not; for whatever mineral is taken and disposed of is gone, never to return. (See Palms v. Palms, 68 Mich, 355, 36 N. W. 419; Hook v. Garfield Coal Co., 112 Iowa 210, 217.) Suppose that the state owns a section of school land with the oil deposits therein perfectly known by reason of the fact that the surrounding land has been fully proven. If this section is sold for, say, a million dollars, there would be no doubt whatever that the proceeds would go to the permanent fund. But, suppose that the state prefers, for the best interests of the commonwealth, to lease the land on a royalty basis. Here the price, the value, would necessarily be paid for in installments, but it would be folly to say that the nature of the proceeds would thereby be changed from principal to income, and that hence they should go into the income rather than the permanent fund.

Hence we can readily see, that if we want to receive any light from adjudicated cases and other authorities, we must turn to that class which deals with the disputes arising on one side of a mineral lease only—those involving the rights of the parties entitled to receive or not receive the royalty. Fortunately, we have many of them, and it will be noted that in them the relation of landlord and tenant is not at all disputed as between the parties to the lease; and that the proceeds of the lease constitute rent is not denied.

A life tenant has the right to the income from property including rental which arises from the ordinary use of the property. The remainderman or revisioner owns the prin-

cipal, the corpus of the property, and has the right that this principal be turned over to and preserved for him as nearly unimpaired as practicable.  (21 C. J. 949.)  The income and the permanent funds involved in the case at bar occupy a similar and strikingly analogous position; the former is entitled to the income, including rental arising from the ordinary use of the property, the permanent fund is entitled to have preserved for itself the principal, the corpus of the property.  In fact, in the case at bar, the preservation of the principal is of greater importance; for a life tenant lives in any event but a comparatively short time and would in any event in all likelihood consume but a portion of the principal, but the current, or income fund, will be forever co-existent with the permanent fund.  Hence the cases dealing with the above mentioned analogous situations are clearly applicable to, and as we believe, decisive of, the case at bar.  It is true that at times royalties arising from mineral leases have been considered as ordinary rents. Where a life estate, with remainder over, has come into existence, and the life tenant finds open mines upon the land, he may continue to use the mine and such use is considered as ordinary use; or if provision for the opening of mines has been made before the life tenant's estate takes effect, the same principle obtains.  (21 C. J. 947.)  We need not pause to consider the origin or reason for this rule, since it is not applicable here, no open mines existing upon the lands in question at the time that the rights of the two funds accrued.  Generally, however, consumption is not an ordinary use; the one disposes of the principal, the other leaves it intact, or substantially so.  The principle was discussed by Lord Blackburn in the case of Campbell v. Wardlaw, 8 App. Cas. 641, 644.  He said in part:

"The principle upon which the whole matter depends is the same both in English and in Scotch law, and I should be inclined to think that it would be very much the same in every country, for it is the nature of things that causes it to be so.  Where there is 'produce,' such as minerals

which, when once taken away, is never replaced, it is in a very different position from, I may say, apples or fruits of that kind, which are annually reaped and which replace themselves. That they are different in the nature of things is obvious enough. When there is an estate consisting partly of minerals or things of that sort, and partly of animal products in the other sense, such as fruits and the like, and that estate comes to a person with a limited interest, the remainder being in somebody else, the question would arise, What is to be done with the produce? The law of England, and I believe of every country, the feudal law and the civil law too, would say that in that case the person who has the limited interest takes, beyond all doubt, the annual produce, the grass, the apples, and things of that sort, and applies them to his own use as he pleases, as long as his interest lasts. But it would follow, from the strict rule which I have mentioned before, that minerals, whether the mines had been opened or not, would remain a part of the soil belonging to the person who was to have the ultimate interest in the soil: the remainderman, as he would be called in England, or the fiar as he would be called in Scotland, would take them all.''

Accordingly, under the common law, life estates, whether conventional or arising by operation of law, were impeachable for waste, unless the instrument creating a conventional life estate expressed a contrary intention. (Poole v. Union Trust Co., 191 Mich. 162, 167.) And courts have been unanimous in holding, or at least substantially so, that a life tenant has no right whatever, as against a remainderman, to open up new mines or quarries or oil or gas wells, or lease the land for that purpose to others. He may be enjoined from doing so; such a lease made is void; the proceeds arising therefrom belong to the remainderman, if he receives them. (21 C. J. 947, 949; Shulthis v. MacDougal, 162 Fed. 331; Hook v. Garfield Coal Co., 112 Iowa 210, 83 N. W. 963; Prout v. Hay Oil Co., 263 Ill. 54, 105 N. E. 26; Kenton Gas etc. Co., 17 Ohio Cir. Ct. 101; McCoy v.

Ferguson, 164 Ky. 136, 175 S. W. 23; Gaines v. Green Pond Iron Co., 32 N. J. Eq. 86; Westmoreland Coal Co.'s appeal, 85 Pa. St. 344; Bond v. Gossey, 99 Va. 564, 39 S. E. 216; and see additional cases cited later.) A similar principle exists as to timber. (21 C. J. 950, 951.) Let us quote here from just one case, that of Ohio Oil Co. v. Daughetee, 240 Ill. 361, 88 N. E. 818, 36 L. R. A. N. S. 1108. There the mine was opened by a trustee representing both the life tenant and the remainderman. The court said as to the power of the trustee:

"The only management and control contemplated was that which had to do with the annual proceeds of the land. The authority of the trustee was to grant ordinary farming leases, in accordance with the ordinary terms of the neighborhood, but not unusual leases of unopened mines. * * * Granting that the trustee held the title in fee, he held it for the benefit of the remainderman as well as the life tenant, and had no right to waste the estate for the benefit of the life tenant, at the expense of the remainderman. It is a well established rule of law that the opening of new mines upon land by a life tenant amounts to waste. * * * The same rule applies to oil wells. Oil is a mineral and part of the realty. Owing to its fugitive nature, a grant of oil under the ground is a grant, not of the oil in place in the earth, but of such oil as the grantee may find there and save. * * * There were no oil wells on the land at the time of the testatrix' death. A tenant for life under such circumstances would have no right to operate for oil on the land. * * * Neither could a trustee operate for his benefit. The taking out of the oil would be waste which a court of equity will enjoin."

At the time of the grant of the school lands to the income and permanent funds involved in the case at bar, no mines had been opened, no oil or gas wells existed on the land. No provision, express or implied, is contained in the grant permitting the trustee for the fund entitled only to the income to open up new mines on the lands granted. And, applying

the rules of law above mentioned, all minerals contained in the land, including oil and gas, belonged to and was a part of the corpus of the land. The state, or the land board, acting only as trustee for the income fund, had no authority or right whatever, to cause any mines, or oil or gas wells, to be opened thereon. The state, however, or the board, might do so when acting as trustee for both the income as well as the permanent fund, assuming that legislative authority existed therefor. And such authority existed. But in such case, just as in the case of a life tenant and remainderman, the income fund has the right to have the royalties invested and receive the interest thereon, but the principal belongs to the permanent fund. (21 C. J. 947; Maher v. Maher, 73 Vt. 243, 50 Atl. 1063; Cecil v. Cecil, 161 Ky. 419, 170 S. W. 973; Keniston v. Gorrell, 74 N. H. 53, 61 Atl. 1101, and see other cases cited later.) With this general statement of the law, let us turn to the consideration of some of the cases, pausing first to say that had provision for placing money arising from the *lease*, as well as the sale, of the land in the perpetual fund, been omitted from Section 2, supra, leaving only the provision of Section 7 to cover the disposition of the proceeds of a lease, the royalties might then, in our opinion, have been considered as rents within the meaning of Section 7, supra.

In the case of Barnes v. Keys, 36 Okla. 6, 127 Pac. 261, the court said:

"It is settled by a long line of decisions, beginning with Stoughton v. Leigh, 1 Taunt. 402, that a life tenant cannot open new mines. * * * The doctrine or theory of these cases is that the opening of new mines is a permanent injury to the inheritance, constituting waste. In other words, it is held that the minerals are part of the land itself, and that the life tenant has no right to take minerals any more than he would have the right to sell or dispose of a part of the surface of the land. But * * * the quesion is, all having agreed that the lease should be made, what interest would each have in the income from the lease. It

would seem that their interests would be the same as if that much land has been sold; the life tenant would be entitled to the income from the purchase price.   *   *   *   And it follows that the proceeds of the oil belong to the remainderman just as the proceeds of the land itself would; but the owner of the life estate would have the right to interest on the royalties produced during his life.''

In the case of Meredith v. Meredith, (Ky.), 235 S. W. 757, the court, in a similar case, said:

''In the recent case of Crain, Gdn. v. West Adm'r., 191 Ky. 1, 239 S. W. 51, in referring to these cases, we said: 'In those cases it was held that inasmuch as the life tenant had no right to open the new mines, nor to the products of the mines when opened, and the remaindermen had no right to the use of the land during the life tenancy, the life tenant was entitled to the interest on the income or use of the royalties during life, but the corpus of the royalties, like the land from which it came, was the property of the remainderman, and should be preserved for them.' In none of these cases, however, was there any agreement between the parties as to how they should divide among themselves the royalties retained in the lease, and they were, therefore, divided by the court according to their primary interest in the land; to the life tenant the income for life on the whole of the royalties, and to the remainderman the preserved corpus of the royalties after the death of the life tenant. Such distribution, in the absence of an agreement between the parties, is in accord with reason and meets with our approval.''

In the case of Minner v. Minner, 84 W. Va. 679, 100 S. E. 509, the court, after stating that the life tenant had only the right to continue operating mines already opened, said in part:

''All else belongs to the corpus of the estate, and must be preserved intact. Hence it is waste for such tenant to open or authorize the opening of new wells. (Williamson v. Jones, 43 W. Va. 562, 27 S. E. 411, 38 L. R. A. 694, 64 A. S.

R. 891.) In case he does so, the yield therefrom is not part of the issues and profits, but a part of the corpus of the estate, and the proceeds or return derived from the sale of such product must be preserved and invested for delivery to the remainderman or revisioner upon the commencement of his estate. These proceeds now stand in the place of and represent that part of the corpus which has been removed. This question is usually presented in the form of a joint lease by the life tenant and remainderman, reserving royalty or rent, and in such case the *royalty or rental, being part of the corpus,* is invested and preserved for the remainderman; but the interest thereon, being the yield therefrom, is paid to the life tenant, since the nature of his estate entitles him to the yield from the corpus of the realty.''

So in the case of Swayne v. Lone Acre Oil Co., 98 Tex. 597, 69 L. R. A. 986, 86 S. W. 740, 8 A. & E. Ann. Cas. 1117, in a case where the life tenant had only a third interest of the land, the court said in part:

''It is too well settled to require citation of authority that while it is not waste for a tenant by the curtesy or by a tenant in dower to work an open mine, it is waste to open a new mine. In other words, the tenant of a life estate punishable for waste has no right to remove the minerals, when the land had not been devoted to mining purposes before the creation of his estate. Oil before its extraction is a mineral and is a part of the land, and insofar as the question under discussion is concerned it is to be considered like iron, coal, lead, or other mineral substance, * * *. The right of the life tenant is to the use and not to the corpus of the estate, and where his title is in an undivided interest and not in the whole of the land, and a sale is ordered for partition, his right in the proceedings is not a part proportionate to the undivided interest in which he has the life estate, but to the interest on that part as long as the life estate may continue to exist. In speaking on this subject in reference to the remainderman, Chief Justice Marshall in Herbert v. Wren, 7 Cranch. 379, says: 'They have a right to insist

that, instead of a sum in gross, one third of the purchase money shall be set apart, and the interest thereof paid annually to the tenant in dower during her life.' The rule thus stated is followed in North Carolina. (Ex parte Winstead, 92 N. Car. 703.) The same principle is announced in Alabama. (McQueen v. Turner, 91 Ala. 273, 8 So. 863; Kelley v. Deegan, 111 Ala. 152, 20 So. 378.''

That under such circumstances the remainderman is entitled to the principal and the life tenant to the interest only is also held in Blakley v. Marshall, 174 Pa. St. 425, 34 Atl. 764; McFadden's Estate, 224 Pa. St. 443; Deffenbaugh v. Hess, 225 Pa. St. 638, 74 Atl. 608, 36 L. R. A. N. S. 1099; Stewart v. Tenant, 52 W. Va. 559, 44 S. E. 223; Eakin v. Hawkins, 52 W. Va. 124, 43 S. E. 211; Campbell v. Wardlaw, 8 App. Cas. 641. The principle is also approved in Matlack v. Kline, —— Mo. App. ——, 190 S. W. 408. So in Dicken v. Hamer, 2 Law Times 276, and Maher's Adm'r. v. Maher, 73 Vt. 243, it was held that the consent of the life tenant to the lease for mining gave him no interest in the mineral found. The principle first mentioned was applied in regard to timber in the case of Keniston v. Gorrell, 74 N. H. 53, 64 Atl. 1101, where the court said:

''Conceding that the plaintiff had no right to cut and sell any of the timber   *   *   *   she nevertheless had the right to have it remain upon the premises; and as it has been severed without her fault, she is entitled to an estate for life in the proceeds, and to have the proceeds invested and the interest paid to her.''

Counsel for relator rely especially on the case of State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520, where under a constitution similar to ours, the Supreme Court of Minnesota held mineral leases similar to those involved in the case at bar to be valid. The direct point involved in that case was whether the leases were in violation of the constitutional provision requiring all school lands to be sold at public auction. The court in the opinion refers to the royalties as rents; it did not refer to it as ordinary rent,

compensation for the ordinary use of the land. Whether subsequent Minnesota cases have considered such royalties as ordinary rent does not appear either. Boeing v. Owsley, 122 Minn. 190, 142 N. W. 129, involved royalty accruing to the person with the limited estate from mines which had been opened previous to the accrual of his rights; and the case is accordingly not inconsistent with our holding herein. In the case of State v. Royal Mineral Association, 132 Minn. 232, 156 N. W. 128, it appears that defendant owned some mineral lands which he had leased to other parties upon a royalty basis. He was assessed with $30,000.00 as credits for royalty still to accrue under the leases. It was held that the royalty was rent, that unaccrued rents are not personal property, and hence the defendant was not assessable for them. It is accordingly quite clear that the Minnesota court has in no case passed upon the question involved in the case at bar, and in no case has indicated that should the question involved in the case at bar come before it, it would hold different from the conclusions we have reached herein. The decision in the Evans case has been said to have been ex necessitate, and based mainly on the doctrine of estoppel, the leases being held valid on account of the great amount of money expended on the faith of the validity of the leases. (Von Baumbach v. Land Co., 219 Fed. 31.) If the case could be construed as holding royalties as ordinary rent, then we might, in the first place, say that the question in this case was not involved in that case. Again, a trustee with power to act, cannot by creating an estoppel against himself as to the validity of an instrument under which he disposes of property conditionally or otherwise, also estop beneficiaries to claim, as between or among themselves, that portion of the proceeds to which they are justly entitled. The proposition would seem to be self-evident, and a contrary assertion would appear to be its own refutation. However, we have read the Evans case with considerable care, and we have no reason to think the conclusion reached in that case as to the validity of the mineral leases to be wrong, even aside

from the doctrine of estoppel, and without affecting the question in the case at bar. We have already said that under Section 2, supra, of our constitution, it is plainly contemplated that part of the corpus of the land may be disposed of by leases. Other provisions of the constitution provide that no *sales* shall be made of school lands except at public auction; but nothing is said as to leases; no specific prohibition, certainly, against the execution of mineral leases without public auction, exists. The leases themselves, and by themselves, without more, do not accomplish a sale. The final disposition of the oil or gas, or sale, if we please to call it so, does not take place, is not in any event consummated, until after the oil is taken from the earth, has become severed from the realty, and has become personal property. There is a peculiar difficulty, as pointed out in the Evans case, of disposing at public auction of minerals contained in the land, the quantity of which is, nay, even the very existence of which may be, doubtful, and in the absence of more specific provision in our constitution, we should not be inclined to hold that such leases are invalid unless let after public auction. Method and means should, necessarily, be of secondary moment. The matter of primary importance here is the realization of the best price possible for the benefit of, and to preserve, the permanent fund. The exploration for minerals can injure the land but little; nor is a disposal thereof involved therein. If minerals are discovered, the ultimate aim of receiving ten dollars per acre or better, is at least generally more than realized. And it would seem that the theory of the Evans case, namely, that the constitution intended the disposal of land to be at public auction only in those cases where the sale is of the land in bulk, is not unjustified. But that in no way affects the question at hand, for, as heretofore fully shown, the permanent fund is, under specific provision of our constitution, entitled to the royalty of mineral leases which is paid for part of the corpus, the principal of the land, and that specific provision must control here.

We realize that this decision is of vital importance, and may disappoint expectations of relief which, to say the least, would be welcome to many under present economic and financial conditions. We have no doubt that a decision upholding the constitutionality of the legislative acts in question would have met with popular approval. But in doing so, we should have been derelict in our duty. We think it clear, and beyond any reasonable doubt, that Chapters 66 and 147 of the Session Laws of 1921, insofar as they contemplate and direct the payment of royalties from mineral leases on school lands into the land income fund is in contravention of Section 2 of Article 7 of the Constitution of this State, and hence null and void, and the writ of mandamus prayed for herein must accordingly be, and the same is hereby, denied.

*Denied.*

POTTER, Ch. J., and KIMBALL, J., concur.