MISSOURI PACIFIC RAILROAD COMPANY, THOMPSON,
TRUSTEE, *v.* STROHACKER.

4-6368                                                   152 S. W. 2d 557

Opinion delivered May 26, 1941.

*Henry Donham* and *Pat Mehaffy,* for appellant.

*Arnold & Arnold, Carter & Smith* and *Paul Jones,* for appellees.

GRIFFIN SMITH, C. J.  Certain lands in Miller county were federal government grants to St. Louis, Iron Mountain & Southern Railway Company.  The Iron Mountain Company's rights were acquired by Missouri Pacific Railroad Company.  In 1892 and 1893, however, the Iron

Mountain Company made certain conveyances, reserving "all coal and mineral deposits."[1]

Appellees, as fee-simple owners, seek to cancel the reservations and to quiet in themselves title to oil and gas. Their contentions are that when the reservations were written into the deeds it was not intended by the term "all coal and mineral deposits" to include gas and oil.

The chancellor sustained contentions of the plaintiffs. The question here is one of construction, or intent.

The government grant to Iron Mountain Company reserved "all mineral lands within the limits of the grant made in § 2 [of the Act of Congress in question]."

An agreed statement covers all facts considered by the chancellor. Essentials are as follows:

F. E. Bates, Missouri Pacific chief engineer, made an examination of office files, and found that the land in question was originally conveyed to Big Wood Lumber Company. In 1892 and 1893, when the deeds were delivered, counsel for Iron Mountain were not certain what construction should be placed on the government's reservations. It was feared by the attorneys that, after the patents had been issued, the government might undertake to reclaim minerals, and "at least one of the reasons for reservations [in Iron Mountain deeds] was this fear . . . that if a fee-simple absolute title were conveyed by the railroad company and the government should subsequently reclaim any minerals within said lands under the provisions of [Act of Congress of 1866, 14 Stat. 1, 338], the railroad would be required to respond to the purchasers of the land for damages under its warranties."

The engineer's statement was predicated upon various letters in the railroad company's files—letters evidencing correspondence between the company proper, and officers of Missouri Pacific Land Grant Land Depart-

---

[1] Recitals in the deeds were: "Reserving all coal and mineral deposits in and upon said lands with the right to said [grantor], its successors and assigns at any and all times to enter upon said lands and to mine and remove any and all coal and mineral deposits found thereon without any claim for damages on behalf of said [grantee], his heirs or assigns."

ment. May 9, 1887, attorneys for Iron Mountain wrote the Iron Mountain land commissioner that it was the opinion of Judge Portis, as well as that of Judge Pike, that the act reserving mineral lands from grants to railroad companies was binding upon the company, "and for that reason, whenever land is sold, it is sold with the reservation attached."

In 1898 certain government granted lands were conveyed, the railroad company reserving "all coal and mineral deposits." Thereafter a wheatstone company undertook to purchase the mineral rights so reserved by the railroad company. In a letter written by the company's general attorney in 1899, addressed to the company's land commissioner, it was recommended that the conveyance be in exact terms of the reservation, and by special warranty deed. It was said: "The reason I advise a special warranty is that some question may possibly arise as to your having anything to convey under the mining reservations of the United States. I therefore would not by general warranty convey the 'mineral deposits' of any land."

The agreed statement commits the parties to the proposition that the phrase "coal and mineral deposits" was used in the deeds to make the reservation as broad as any possible reservations of the government under the federal statutes.

The entry on coal lands was under act of March 3, 1873, 17 Stat. L. 607, and for this reason the department of the interior in its circulars and letters usually referred to coal lands as not included in the general classification of "mineral lands." In 1883 Commissioner McFarland of the interior department ruled that while coal lands, in the general sense of the word, are minerals, they had not been held subject to entry under the mining laws, "but have always, since a date long prior to passage of the mining act of 1866, been disposed of under special statutes at private cash entry. Said entries are not mineral entries, and have never been so designated in this office."

The agreed statement mentions that between June and December, 1890, First Assistant Secretary Chandler,

in writing to the commissioner of the general land office, stated that certain lands were not shown to be, "as a present fact, valuable for coal or other minerals."

A letter from the interior department, written in 1890, made comment that the act of 1864, which amended an act of 1862, "enlarged the grant from five to ten sections per mile on each side of said road, and provided, among other things, that the term 'mineral lands' wherever used therein, or in the original act, should not be construed to include coal and iron lands; that no lands granted by the act of 1864 or the original act should include any mineral lands."

It was the view of Engineer Bates that the phrase "coal and mineral deposits" was a common expression in various documents of the interior department and in files of the Iron Mountain land department at Little Rock.

On the question of intent as to the reservations, the history of oil and gas discovery is reviewed by C. W. Rapp, U. S. land commissioner, as shown in the footnote.[2]

In Arkansas exploratory work seems to have been done as early as 1888, according to reports made by State Geologist John C. Branner. In respect of that period, Branner mentions the occurrence of oil and gas in the vicinity of Fayetteville. His summary was that many people had been led to believe that "something substantial might be realized from it." His comments are shown in the margin.[3]

---

[2] "Oil in the United States is generally accepted as having been discovered near Oil Creek in North Pennsylvania on August 29, 1859. In 1860 a showing of oil was discovered in a shallow pool near Paola, Kansas. In 1862 a small well was brought in near Florence, Colorado, and in 1867 some minor production was obtained in the Hilliard field in Southwest Wyoming. In 1873 oil was found in central Wyoming. In 1875 oil was being produced from small wells in the Los Angeles basin of California, and in the year 1876 California is credited with the production of 12,000 barrels of oil. In 1889 some shallow wells were produced in Southeast Kansas, and exploration had extended across the line into the then Indian territory, the production in the Indian territory in 1891 being only 30 barrels of oil, which had increased in 1897 to 625 barrels. In Texas oil was being produced from a few shallow wells near Nacogdoches in 1887, and from the San Antonio area in 1889. In 1895 the Corsicana field was opened."

[3] "During the summer of 1888, Mr. J. W. McWilliams, a representative of the Union Oil Company, is said to have made an examination of the region within a radius of 5 miles of Prairie Grove for the

Appellant quotes certain data to show that congress, in 1886, may have had in mind the possibility of oil in Arkansas when the land grant act was passed. In a second report entitled, "Geological Reconnoissance of Arkansas," David Dale Owen, in 1860, discusses discoveries in Pennsylvania. Regarding Arkansas geology he made the observations shown in the fourth footnote.[4]

Union Coal Company, of Ouachita county, was (in 1860) erecting a plant for distillation of oil from lignite.[5]

In further substantiation of its contention that oil was recognized as a possibility when the land grants were executed, appellant quotes from communications by Secretary Lamar, dated in 1885 and 1886.[6][7]

purpose of boring for oil. The project has apparently been abandoned on the ground that the company could not lease the amount of land desired. . . . There was more or less excitement a few years ago about oil found in Cove Creek. . . . One hole about 12 feet deep and another about 50 feet deep were drilled about 1887, but nothing of importance was developed. . . . The rock in which the oil occurs is a soft, snuff-colored sandstone having a total thickness of about 50 feet." In Volume II of the Arkansas Geological Survey for 1888, written by the late John C. Branner, then State Geologist, in discussing the Mesozoic Border across Pike county in Southwest Arkansas, on page 281, it is said: "In the southeast corner of section 4, a boring was made some years ago in the expectation of finding oil. Within 10 feet of the surface a black substance was struck which resembled coal in appearance and which burned rapidly when ignited. The boring was continued about 60 feet, at which depth a hard rock was struck and work discontinued." In another report of the Arkansas Geological Survey, Volume II for 1891, the same authority, on page 66, under the heading "Oil and Gas—the deep well at Fayetteville" states: "Inquiries are often made of the geological survey regarding the chances of finding oil and gas in Benton county. . . . An expensive deep well (1,480 feet) was put down at Fayetteville in 1891 in the hope of finding oil or gas, or both. . . . The Fayetteville deep well was sunk by the Washington County Mining Co. to a depth of 1,480 feet."

[4] "These tertiary and quaternary lignites, according to the distillation analyses conducted in my laboratory, yield from 30 to 45 gallons of crude oil to the ton of 2,000 lbs. The oil is of superior quality generally. . . . Since the wonderful discoveries of native 'rock oil' which have recently been made, the price of coal oil has been greatly reduced."

[5] Mr. Owen said: "According to the report of a chemist in New Orleans, who tested this coal, the most oil obtained was 20.9 gallons; but Mr. Britton, the superintendent, thinks it will not average more than 20 gallons to the ton. The upper part, underneath the Shaley layers on the very top, is the richest in oil."

[6] The secretary said: "A careful examination of the testimony shows that the contestant has failed to establish the character of the land as oil land and, therefore, subject to location under the mineral laws. . . . I have before me the request of counsel for Samuel E. Rogers, applicant for patent for the Washington, Adams, Jefferson,

Beginning in 1932 mineral rights to the lands here involved were separately assessed under authority of act 221, approved March 27, 1929.[8] It is argued by appellees, however, that for 35 years appellant and its predecessor failed to make separate assessments, and that by conduct it permitted those who acquired the lands either originally, through inheritance, by mesne conveyances, or by purchase of tax titles, to assume that no claim would ever be advanced for subterranean products not looked upon as minerals at the time conveyances were executed. Insistence is that it would be inequitable, at this late period, for the railroad company to recover under the reservations when, by admissions of its own officials, the primary purpose in excluding "coal and mineral deposits" from the conveyances was to protect itself from liability in the event it should be determined that "all mineral lands within the limits of the grants made" were reserved by the government in the sense that any product finally classified as mineral would come within the general classification.

If the reservations had been made at a time when oil and gas production, or explorations, were general, and

and Madison locations of oil placer claims in the Cheyenne, Wyoming, land district, for the allowance of the entry as applied for. Said request is based on the finding that the land is only fit for extracting petroleum, in the report of a special agent of your office, who was directed to investigate the tracts in question. . . . The above mentioned investigation into the character of the improvements upon the claim was ordered in view of department ruling of January 30, 1883. . . . And for the purpose of determining 'whether or not the same ruling should apply to oil land'."

[7] Following is the testimony of "a competent witness": "No wells for oil or gas or distillate have ever been drilled on any of the lands in question, and no oil or gas or distillate has ever been produced therefrom. No oil or gas or distillate had been produced in Arkansas at the date of the deeds from the St. Louis, Iron Mountain & Southern Railway Co. described in the complaints as conveying the lands involved in these suits. There was then no production in Louisiana, and production in Texas was very small, amounting to only 50 barrels in 1894. There had been no litigation in Arkansas about oil or gas at the time of said deeds, and the first such reported case in Arkansas was *Mansfield Gas Co.* v. *Alexander*, 97 Ark. 167, decided in 1911. The first reported oil case in Louisiana was in 1904. There was no oil or gas in substantial quantities being produced at the date of these deeds in any state through which the lines of the Iron Mountain extended. Coal and iron were produced in Arkansas prior to the date of said deeds."

[8] The act is referred to in the briefs as § 1360 of Pope's Digest. It appears as § 13600, and amended § 9856 of Crawford & Moses' Digest. [See act 30, approved March 1, 1897, p. 38.]

legal or commercial usage had assumed them to be within the term "minerals," certainly appellant should prevail. As early as 1911 gas was referred to in this state as a mineral. *Osborn* v. *Arkansas Territorial Oil & Gas Company*, 103 Ark. 175, 146 S. W. 122. See, also, *Bodcaw Lumber Company* v. *Goode*, 160 Ark. 48, 254 S. W. 345, 29 A. L. R. 578, where Ruling Case Law, and Thornton on the Law Relating to Oil and Gas, are quoted.

Our attention is directed to *Belleville Land & Lumber Co.* v. *Griffith*, 177 Ark. 170, 6 S. W. 2d 36. After identifying the reservation considered in that case as similar to that contested in the instant case, appellants argue that since such reservation was upheld in the Griffith Case it should be upheld in the case at bar. The difference is that in the Griffith Case oil and gas were not the subjects of controversy. In the opinion there is also this language: "The mineral rights were not thought of by either party, and there is no evidence in the case tending to show that the mineral rights on the land in controversy are valuable." The chancellor allowed a reduction of $1 per acre from the purchase price as offset against value of the minerals. There was no appeal from this allowance.

If appellant were otherwise entitled to a reversal, such right would not be affected by adverse possession. *Grayson-McLeod Lumber Co.* v. *Duke*, 160 Ark. 76, 254 S. W. 350; nor are mineral rights underlying a tract of land lost on failure to pay taxes thereon unless there has been a separate assessment. *Claybrook* v. *Barnes*, 180 Ark. 678, 22 S. W. 2d 390, 67 A. L. R. 1436.

In *Greene County* v. *Smith*, 148 Ark. 33, 228 S. W. 738, it was held that certificates evidencing interest of $3,000 in a common-law trust were not personal property in Arkansas where the trust holdings consisted exclusively of an oil and gas lease covering lands in Texas. The opinion, written by Mr. Justice WOOD, concludes with this expression: "For the purpose of taxation, a lease on land in Texas for oil and gas production is real property and not subject to taxation in this state."

We expressly held, in *Sheppard* v. *Zeppa, Trustee*, 199 Ark. 1, 133 S. W. 2d 860, that a reservation of "min-

eral rights'' pertaining to certain lands was effective to withhold oil, gas and other minerals from a conveyance.

It can no longer be doubted that a reservation of minerals, or of mineral rights, is sufficient to identify oil and gas.[9]

In *United States* v. *Southern Pacific Company*, 40 S. Ct. 47, 251 U. S. 1, 64 L. Ed. 97, it was said: "All 'mineral lands' other than those containing coal and iron were excluded from the grant, and this exclusion embraced oil lands." This opinion was written in 1919, but it does not purport to interpret the intent of the railroad company's management in the execution of deeds conveying to the company's grantees. This case preceded by five years that of *Burke* v. *Southern Pac. Railroad Company*, 234 U. S. 669, 34 S. Ct. 907, 58 L. Ed. 1527.[10] It was there said [in respect of granting acts expressly excluding "all mineral lands"] that no attempt was made to define mineral lands other than iron and coal lands, and that doubtless the ordinary or popular signification of that term was intended. Apparently, says the opinion, it was used in a sense which, if not restricted, would embrace iron and coal lands, "else care hardly would have been taken to declare that it should not include them." This, said Mr. Justice Brown, was deemed a reasonable inference in *Northern Pacific Railroad* v. *Soderberg*, 188 U. S. 526, 47 L. Ed. 575, 23 Sup. Ct. Rep. 365 (1903), where a contention that it embraced only metaliferous lands was rejected."[11] Other cases to the same effect might be mentioned, e. g., *Bourdieu* v. *Pacific Western Oil Company et al.*, 8 Fed. Supp. 407 (1934); *Crain* v. *Pure Oil Co.*, 25 Fed. 2d 824 (8th C.C.A.).

[9] See cases upon which the text is predicated, 40 C. J., pages 738 and 980; 18 R. C. L., pages 1176 and 1206; Thornton, Oil and Gas (Willis Edition), § 474, p. 795; Summers on Oil and Gas (Permanent Edition), § 135, p. 332.

[10] The case was decided in 1914.

[11] The opinion concluded with this expression: ". . . But, passing this seeming divergence in opinion, and assuming that, when subjected to a strictly scientific test, petroleum is not a mineral, we think that is not the test contemplated by the statute. It was dealing with a practical subject in a practical way, and we think it used the words 'mineral lands,' and intended that they should be applied, in their ordinary and popular sense. In that sense, as before indicated, they embrace lands chiefly valuable for petroleum."

A case referred to by appellants as being on "all fours" with the instant appeal is *Luse* v. *Boatman* (Tex.), 217 S. W. 1096. The decision was handed down in 1919 and has frequently been cited by other courts. It discusses what was termed the minority rule of Pennsylvania (*Dunham* v. *Kirkpatrick*, 101 Pa. 36, 47 Am. Rep. 696), announced in 1882. Subsequently Pennsylvania courts treated gas and oil as minerals. The Luse case concludes:

"In view of the great preponderance of judicial expression from the various state courts of last resort, announced prior to the time when Ammerman acquired title to the land, to the effect that oil and gas should be construed as within the term 'mineral' or 'minerals' in a reservation, we are of the opinion that Ammerman himself acquired no title to the oil and gas under his land, and therefore could not convey such title."

In most of the decisions holding that oil and gas were included in reservations of minerals, there were circumstances denoting such intent; and, where purposes of the parties can be ascertained from a writing or from general customs, and effect can be given such intentions without impinging a settled rule of law, it should be done. *Beasley* v. *Shinn*, 201 Ark. 31, 144 S. W. 2d 710, 131 A. L. R. 1234.

It was said in *Detlor* v. *Holland*, 57 Ohio St. 492, 49 N. E. 690, 40 L. R. A. 266 (Ohio), that a deed made in 1890 conveying mining rights should be construed in the light of oil developments as they then existed in the vicinity of the land.

A conveyance of "all the coal and other minerals" was held to exclude oil and gas. *Gordon* v. *Carter Oil Co.*, 19 Ohio App. 319. The case was decided in 1924, and the opinion says that in determining whether oil and gas passed under the conveyance, the question should be answered in the light of the deed's language, together with facts, circumstances, and surroundings of the parties at the time the deed was executed.

In *Lehigh Zinc & Iron Co.* v. *New Jersey Z. & I. Co.*, 55 N. J. L. 350, 26 A. 920, it was held that the best and

surest method of expounding an instrument is by referring to the time when, and the circumstances under which, it was made.[12] Or, expressed differently, a contemporaneous construction is best and most powerful in law. See *Boyd* v. *United States,* 116 U. S. 616, 29 L. Ed. 746, 6 S. Ct. 524.

Devlin on Deeds, v. 2, edition of 1887, states the rule of that time to be: ''Petroleum is not included under a reservation of all minerals.''

In *Beury* v. *Shelton,* 151 Va. 28, 144 S. E. 629, the court said: ''If it had been intended to reserve limestone, it seems rather clear that it would have been done explicitly in an instrument which bears every evidence of careful and skilled preparation.''

A Kentucky case—*McKinney's Heirs* v. *Central Kentucky Natural Gas Co.,* 134 Ky. 239, 120 S. W. 314—decided in 1909, contains this language: ''We may here remark that, if the excitement at time was caused by the discovery of natural gas, it is strange that in drawing the conveyance they did not use words which would have, without doubt, included natural gas. In addition to the oral testimony as to the history of natural gas at the time the conveyances were made, we will consider the language of the conveyances to ascertain the intention of the parties at the time they were executed. . . . There is nothing to show that natural gas should be included in the word 'minerals,' and the easements granted in connection with the rights therein conveyed are not applicable to the production of natural gas, which shows that it was not intended that gas was to be included in the conveyances.''[13]

A reservation of ''all the minerals on said land'' is discussed in *Kentucky Coke Co.* v. *Keystone Gas Co.,* 296 F. 320 (C.C.A., Ky., 1924). It was thought that the clause was ambiguous and that a proper construction of the deed required consideration of the circumstances connected with its execution, and the understanding and

---

[12] In the opinion use is made of the phrase: *"Contemporanea expositio est optima et fortissima in lege."*

[13] The "easements" referred to were reservations "to enter upon said lands and to mine and remove any and all coal and mineral deposits found."

intention of the parties. Commenting that at the time the deed was executed there existed no understanding on the part of the grantee that the word "mineral" embraced oil and gas, the court said: "The word 'mineral' was used in its narrow and restricted sense, but as then understood by the parties as referring to coal, and nothing else; and to give the word any other meaning as it appears in this deed would be to do violence to the evident intention of the parties and the construction which they placed upon it."[14]

Other decisions to the same effect might be cited.

We agree with Chief Justice GIBSON of Pennsylvania that "The best construction is that which is made by viewing the subject of the contract as the mass of mankind would view it; for it may be safely assumed that such was the aspect in which the parties themselves viewed it." *Schuylkill Nav. Co.* v. *Moore*, 2 Whart. (Pa.) 477.

In 29 Texas Jurisprudence, 680, the following appears: "A grant of minerals does not, of course, include mineral rights not embraced in the deed, nor minerals which were not within the contemplation of the parties." There is a citation to *Carothers* v. *Mills*, 233 S. W. 155 (Tex. C.C.A., 1921), in which this language is used: ". . . However, it does not follow that the term [minerals] must be [construed as including oil and gas], as a matter of law, despite the intention of the parties, especially with relation to a clause in a deed, made when the conveyance in controversy was executed, which was in the year 1899. It may be at this late day, when the exploration for and development of oil and gas are so common, and when courts are so uniformly holding these substances to be minerals, that the ordinary acceptation of the term 'minerals' must be held to include oil and gas."

The Supreme Court of the United States—*Deffeback* v. *Hawke*, 115 U. S. 392, 6 S. Ct. 95, 29 L. Ed. 423 (1886) —held that a statutory reservation of "valuable mineral

[14] It was further said, in respect of the construction given a deed executed in 1921: "The construction given the word 'minerals' by the courts had become known in that community."

deposits'' applied only to deposits known to be valuable at the time of the grant.

Just what was meant by the reservations affecting lands conveyed to Iron Mountain under the land grant acts is not controlling here. Our task is to decide what Iron Mountain meant when it reserved "all coal and mineral deposits." Although there were court decisions holding oil and gas to be minerals, such was not the general construction; and this was particularly true in a country where oil and gas were not given the slightest commercial consideration in connection with land values. "All coal and mineral deposits" undoubtedly were thought to mean, in addition to coal, deposits of substances commonly recognized as minerals; and as to such the reservations are good. *Belleville Land & Lumber Co.* v. *Griffith, supra.*

Since the complaints only ask the court to construe the language as not reserving oil and gas, other minerals are not affected.

The decree is affirmed.

Mr. Justice MEHAFFY took no part in the consideration or disposition of this case.