NEW MEXICO AND ARIZONA LAND COMPANY, a corporation, and Tidewater Associated Oil Company, a corporation, Plaintiffs,

v.

Donald James ELKINS, Mary Catherine Elkins, Thomas Lawrence Elkins, Jr., Edith L. Elkins, Josephine Maude Elkins, Mildred Elkins Allen, Kindred Joseph Elkins, Hattie Belle Elkins, Jack Lee Elkins, Keith Lowell Elkins, Lynn Embert Elkins, David Phil Elkins, Frederick Vernon Elkins, Defendants.

Civ. No. 3010.

United States District Court
D. of New Mexico.

Feb. 6, 1956.

Simms & Modrall by J. R. Modrall, Geo. T. Harris, Jr., & Daniel A. Sisk, Albuquerque, N. M., for plaintiff New Mexico & Arizona Land Co.

Jones, Stiff & Briggs by Wm. C. Briggs, Albuquerque, N. M., for plaintiff Tidewater Associated Oil Co.

Robertson & Skinner by G. W. Robertson, Raton, N. M., Bart W. O'Hara, Charles A. Murdock, Denver, Colo., for defendant.

ROGERS, District Judge.

The question presented on the motion for a summary judgment filed by plaintiffs herein, is whether the clause "all oil, gas and minerals underlying or appurtenant to said lands", in a reservation contained in a deed to property conveyed by plaintiffs, and eventually purchased by defendants, includes and covers uranium, thorium and associated mineral bearing ores in and under all of the lands described in the deeds.

The instant case was filed in this court on the grounds of diversity of citizenship, and the fact that the amount involved is claimed to exceed the sum of $3,000. Plaintiff New Mexico and Arizona Land Company is an Arizona corporation; Plaintiff Tidewater Associated Oil Company is a Delaware Corporation, and each of the thirteen defendants is a resident and citizen of the State and District of New Mexico.

The land involved in this case consists of approximately thirteen thousand acres located in Eastern McKinley County, New Mexico. It consists of odd numbered sections in Township 14 North, Range 12 West, N.M.P.M. The plaintiff New Mexico and Arizona Land Co. conveyed some five thousand and over acres on February 6, 1946, to one Tom L. Elkins, and conveyed in excess of 6400 acres on September 26, 1947, to one Volton S. Tietjen and wife. Those grantees subsequently conveyed the premises to the various thirteen defendants named in this case. The reservation clause in each conveyance is identical, and provides as follows:

"Excepting and reserving to the party of the first part (New Mexico and Arizona Land Company), its successors and assigns, all oil, gas and minerals underlying or appurtenant to said land, together with the right of ingress and egress and of prospecting, developing, and operating said land therefor and removing the same therefrom."

Both of the deeds, which were duly recorded in the office of the County Clerk of McKinley County prior to the origin of the present dispute, contained a further provision: "Subject, however, to easements for roads, highways, railways, ditches, laterals, and telegraph, telephone, and other pole and/or wire lines, and other rights of way now existing,

and also subject to the right of way for road purposes seven and one-half (7½) feet on each side of the north and south center line, and seven and one-half (7½) feet on each side of the east and west center line of each of the sections of land hereinafter described * * *".

The plaintiff Tidewater Associated Oil Co. is the lessee from the plaintiff New Mexico and Arizona Land Co., under a contract dated May 20, 1955, under the terms of which Tidewater was granted by New Mexico and Arizona Land Co. the right to select certain of the Land Company's premises for exploration, discovery, extraction and mining purposes pertaining to uranium, thorium and other fissionable materials. Under this lease agreement, Tidewater chose, among other lands, the ones in question here.

In the complaint filed by the plaintiffs, it is stated that an actual controversy exists between the plaintiffs on the one hand, and the defendants on the other, whereby the plaintiffs contend that New Mexico and Arizona Land Company is the owner of any and all minerals, including uranium, thorium and associated mineral bearing ores in and under the lands conveyed by the Land Company to the defendants, and that Tidewater Associated Oil Co. is entitled to become the lessee as to all such minerals, while defendants, on the other hand, deny the contentions of plaintiffs, and contend that the defendants are the owners of uranium, thorium and associated minerals in and under said lands, and that plaintiffs and neither of them have any right, title or interest thereto.

The answers of the defendants admit, in the main, the allegations in plaintiffs' complaint, but state that the ownership of the defendants in the land is not limited to the surface rights, and the defendants strenuously contend that the plaintiffs have acquired no rights in the lands in question to any uranium, thorium and associated mineral bearing ores, or the right to prospect, explore and test the same, or to operate any works, utilities and facilities upon the land for the purpose of the exploration, development or mining of those ores. The defendants state affirmatively that the reservation contained in the executory contracts of the sale which were drawn in the years 1943 and 1946, did not reserve to the plaintiff Land Company, uranium, thorium and associated minerals, and that it was not the intention of the parties, at the times of the contracts, or at the times of the execution and delivery of the deeds, that such uranium or thorium ore was to be reserved by the New Mexico and Arizona Land Company. Defendants further state that the only feasible mining procedure for uranium, thorium and associated fissionable material, is open pit or strip mining, and that such mining activities will result in washouts, gulleys and arroyos in and across the lands, making the premises dangerous and unfit for the raising of livestock, and any other agricultural products, and will destroy the ability of defendants to earn a livelihood from said lands.

The defendants join in a cross claim whereby, among other relief sought, they pray for a decree quieting the title of the defendants in their respective lands, and to any uranium, thorium and other minerals essential to the production of fissionable materials which may be upon and under said lands.

Subsequent to the filing of these answers, affidavits were filed by two of the defendants, which state, in effect, that in lands adjacent to those in question, uranium bearing ores have been discovered, located in beds or pockets in limestone, at various distances below the surface. These affidavits also state that the mining operations as to such ores, consist, generally, of open pit and strip mining methods, which totally destroy the surface of the land. Lastly, these affidavits state that before discovery of uranium bearing ores in the locality where these lands are situated, in the year 1950, such materials had no commercial value in that locality, and that in fact, such ores were not known to exist in that part of New Mexico.

Whether affidavits in opposition to the motion for summary judgment may

properly be filed, where no affidavits were previously filed by the plaintiffs, need not here be decided, inasmuch as the Court, in ruling on the question presented by the motion for summary judgment, will consider as true, all affirmative allegations of the answers of the defendants, the defendants' cross claims, and the contents of the affidavits, together with all reasonable inferences to be drawn therefrom.

 I am of the considered opinion extrinsic evidence as to the intentions of the parties to the deeds in question is not admissible in this case, inasmuch as the language of the reservation is clear, definite and unequivocal. The phrase "all oil, gas and minerals" is a phrase well known to scriveners of deeds, well known in the mining industry, and well known to the average person. As is stated by the Supreme Court of Washington in Puget Mill Co. v. Duecy, 1 Wash.2d 421, 96 P.2d 571, 574:

> "The intention of the parties in the execution of the contracts of sale is within the rule that the intentions of the parties must be gathered from an inspection of the contract without the aid of extrinsic evidence as an aid in the construction of the instrument."

As is stated in Federal Gas, Oil & Coal Co. v. Moore, 290 Ky. 284, 161 S.W.2d 46, 48:

> "It is only where the language of a grant or exception is ambiguous that extrinsic evidence is admissible".

The Supreme Court of Texas, in Anderson & Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800, 805, 127 A.L.R. 1217, in construing a reservation, refused to admit extrinsic evidence, saying:

> "It is plainly implied, however, from the statement of the rule that when the instrument by its terms plainly and clearly discloses the intention of the parties, or is phrased in language not fairly susceptible of more than one interpretation, the in-

tention of the parties is to be ascertained by the court as a matter of law from the language used in the writing and without aid from evidence as to the attending circumstances."

Referring, again, to the Supreme Court of Kentucky, we find that tribunal, in Maynard v. McHenry, 271 Ky. 642, 113 S.W.2d 13, 14, stating, in regard to a reservation of mineral rights:

> "It is only where the language of the grant or exception is ambiguous that extrinsic evidence is admissible, and, if there are no restrictive words, a conveyance or exception of minerals will include oil and gas. * * * In the deed before us, the language of the reservation is not ambiguous, and no restrictive words are used."

So, also, do we find no restrictive words employed in the conveyances at bar.

In Gibson v. Sellars, a Kentucky case found in 252 S.W.2d 911, 913, it is stated that:

> "Extrinsic proof is competent and may be employed in construing language, the meaning of which is obscure or which is susceptible of two or more interpretations. However, because of the inherent danger of the rule, its use is permitted only in those cases where the language to be construed is so ambiguous or obscure in meaning as to defy interpretation otherwise. An extension of the rule would result in chaos and confusion, and it would be impossible to determine the rights of the parties to a contract without viewing all the circumstances surrounding the execution of the document in question.
>
> "In determining the intention of the parties to the contract before us, we are, therefore, restricted to the instrument itself and we have no right to vary or alter the meaning of the words used in the exception by reference to any prior conveyance."

See, also, Burdette v. Bruen, 1937, 118 W.Va. 624, 191 S.E. 360, Warner v. Patton, Tex.Civ.App.1929, 19 S.W.2d 1111.

It was, in effect, agreed by the parties at the hearing on the motion for summary judgment, and this agreement is likewise reflected from the pleadings herein, that uranium and thorium are "minerals", from the standpoint of a technical, scientific or geological definition. Webster's Dictionary defines "mineral" as: "An inorganic homogenous substance of definite or approximately definite chemical composition, found in nature." The Funk & Wagnall's Dictionary has this definition: "A naturally occurring, homogenous substance or material formed by inorganic processes and having a characteristic set of physical properties, a definite range of chemical composition, and a molecular structure usually experienced in crystalline form."

A detailed, scientific exposition of uranium would consume considerable paper, and would be of limited value to the legal profession. I have, however, found a most illuminating and simple discussion of fissionable material in an article entitled "Mineral Laws of the State of Texas in Relation To Fissionable Materials", written by Jacques P. Adoue, Ben R. Howell and Dwight L. Simmons, appearing in Volume VII, Number 3, Baylor Law Review. So excellent is this description, that I am setting forth a portion thereof as an appendix to this opinion.

Uranium and thorium being minerals within the scientific, geological and practical meanings, would certainly constitute minerals within the purview of the reserving clause "all oil, gas and minerals". We have left only the problem as to whether such minerals must have been known, or were supposed to have been on or under the premises in question, at the time the deeds were executed, in order for the reservation to be effective at this time.

As to this question, we are fortunate, in that the Supreme Court of New Mexico has, to some extent, passed upon the problem in the case of State v. Field, 31 N.M. 120, 241 P. 1027, decided by that Court in 1925. In addition to the New Mexico pronouncement on the question, this Court feels that the majority rule, the best reasoned rule and the modern rule is to the effect that in a grant or a reservation of mineral rights, it is immaterial whether, at the time of the conveyances, the parties thereto knew what minerals were or were not present on the land. See Stowers v. Huntington Development & Gas Co., 4 Cir., 1934, 72 F.2d 969, 971, 98 A.L.R. 536. The court there stated, in holding that all minerals were reserved in a reservation, as follows:

"'Excepting the minerals which are retained for the sake of a compromise with the Parent Oil, Coal and Land Association * * *.

"* * * the possibility that the parties did not suspect the existence of oil and gas in 1873 is of no moment here, for it is firmly established in the law of West Virginia that the word 'mineral' in its ordinary meaning is a comprehensive term, including every substance which can be got underneath the surface, and, if the intention to reserve or convey minerals exists, it is immaterial whether the parties knew what minerals were or were not present."

Referring, again, to the Kentucky case of Maynard v. McHenry, supra, we find the following language:

"The mere fact that a particular mineral has not been discovered in the vicinity of the land conveyed or is unknown at the time the deed is executed does not alter the rule."

In Sellars v. Ohio Valley Trust Co., Ky.1952, 248 S.W.2d 897, 898, 899, the court said:

"Words of a grant of minerals, unambiguous in themselves, cannot be controlled by proof that the parties used them with a definite and limited meaning for the purpose of that particular instrument. This

is the interpretation, although it may be apparent from the circumstances and the then known physical geography of the community that the parties to the instrument did not have some particular mineral in contemplation because they did not know or suppose there was such on the property at the time."

One of the best statements of this rule appears in a decision from our neighboring sister state of Utah. The Supreme Court of that state, in October of 1955, in the case of Western Development Co. v. Nell, 4 Utah2d 112, 288 P.2d 452, 455, had this to say:

"Appellants claim that the fact that oil and gas development in the State of Utah, and particularly the area where these tracts are located, was at least of a minor nature in 1916 demonstrates that the parties did not have these elements in mind when they granted or retained subsurface rights. With this we agree, but such a view is not inconsistent with the conclusion that the parties intended to deal with all the commercial values lying beneath the surface of the land. Concerning the significance of historical circumstances, the authorities are in conflict, some holding that a lack of local development is sufficient evidence from which to conclude that oil and gas were not intended to be conveyed. Missouri Pac. R. Co. v. Strohacker, 202 Ark. 645, 152 S.W. 2d 557; Huie Hodge Lumber Co. v. Railroad Lands Co., supra [151 La. 197, 91 So. 676], and others holding contrary. Rowe v. Chesapeake Mineral Co., 6 Cir., 156 F.2d 752, certiorari denied 329 U.S. 776, 67 S.Ct. 190, 91 L.Ed. 667; Maynard v. McHenry, 271 Ky. 642, 113 S.W.2d 13. It appears to us that the mere fact that a particular mineral had not been discovered in that vicinity would not preclude the granting of rights to such a mineral or limit a grant of 'minerals' to something less

general than all the substances legally cognizable as minerals."

See Rowe v. Chesapeake Mineral Co., 6 Cir., 156 F.2d 752, 755, quoted in the Western Development Co., where the court, among other things, said:

"It is contended that since the presence of gas and oil in this territory was not known at the time of the execution of the deed in 1887, the parties could not have contemplated the presence of these particular minerals, nor have intended the deed to cover them. But this precise question was ruled upon in Maynard v. McHenry, supra, in which the Kentucky Court of Appeals declared that the mere fact that the particular mineral has not been discovered in the vicinity of the land conveyed, or is unknown at the time the deed was executed, does not alter the rule."

Relying, once more, on Anderson & Kerr Drilling Co. v. Bruhlmeyer, supra [134 Tex. 574, 136 S.W.2d 805], we find the court, in rejecting the "lack of knowledge theory", saying:

"To the authorities last cited may be added the decisions above discussed which hold that a reservation of 'minerals' is sufficient as a matter of law to include oil and gas, although at the time the reservation was made coal or other solid mineral had been produced in the community, or state, but oil and gas had not."

This rule is stated so colorfully in the case of Kentucky Diamond Mining & Development Co. v. Kentucky Transvaal Diamond Co., 141 Ky. 97, 132 S.W. 397, 398, decided in 1910, that recourse to the verbiage of the Kentucky Supreme Court must be had:

"The deed here simply conveys 'all the mineral.' These general words aptly include every kind of mineral found on the land. Would it be doubted that, if gold had been discovered, it would have passed by

this deed, although Ratcliff at the time thought he would find silver? Or, if he failed to find silver and had found lead, would it be doubted that this would pass by the deed? It may be true that, when the deed was made, the parties did not know what minerals were under the land, but the fact that they did not have diamonds in mind in no manner affects the conveyance when by it they conveyed all the mineral. When the language of the deed is broad enough to cover everything that may be found on the land, it is not material to the effect of the deed that the parties in fact contemplated at the time that a particular thing might be found on the land. They well knew it was a matter of doubt what would be found. To make the tests shafts had to be sunk, and the different strata had to be examined. What would be found they could only guess, and, when under these circumstances the parties conveyed all the mineral, the grantee is entitled to the precious stones found no less than he would be if he had found platinum or radium, which is perhaps more precious than diamonds."

▮ Deciding as it does, that uranium and thorium are minerals, within the reservation of "all oil, gas and minerals", that extrinsic evidence is not admissible to show the circumstances surrounding the execution of the deeds in question, or the intention of the parties at that time, and that knowledge as to uranium and thorium, and its existence in said premises, is immaterial to the validity of a reservation of the form here encountered, the Court is not unmindful of the various authorities ably researched and presented by defendants' attorneys. As to these authorities, however, the Court is of the impression that they are not controlling herein, for various reasons.

For one thing, many of the defendants' authorities deal with such materials as sand, gravel and stone, the taking of which would be the taking of materials on which the grantees' surface rights would, of necessity, be predicated. Secondly, there run through many of those authorities, other language in the deeds of conveyances, or in the reservation clauses which made the reserving clauses ambiguous. These required the various courts construing these documents, to resort to various canons of construction, such as those requiring a strict construction of a document against the person drawing the same, the invocation of the doctrine of ejusdem generis, and other like rules resorted to by a Jurist in times of confusion.

Here, the grantor employed short, simple words of reservation, a clause of known legal historic meaning, a clause preceded by the all-inclusive word "all", followed by the words "oil, gas and minerals". The first word "all", describes the word "oil", the word "gas", and the word "minerals", and encompasses all minerals, including, specifically, uranium and thorium.

A decree consistent with the foregoing portion of this opinion, and reserving to the defendants and each of them, their joint or several causes of action against the plaintiffs for any damages resulting to their estate as now delineated, from any activities of the plaintiffs in connection with the exploration and mining of minerals, will be entertained by this Court as soon as said decree can conveniently be drawn.

### Appendix

"Mineral Laws of the State of Texas in Relation to Fissionable Materials."
—Jacques P. Adoue, Ben R. Howell and Dwight L. Simmons.

"The late Albert Einstein in 1905 fathered the so-called 'Einstein Theory.' He postulated the equivalence of mass and energy—that Energy equals Mass times the Velocity of Light squared. During the period from 1905 to 1938 scientists over the world and particularly in Europe worked at proving the Einstein Theory. In 1938 Hahn and Strassman, German scientists, in hopes of producing new elements heavier than urani-

um which was then the heaviest known element, bombarded the uranium nucleus with a part of an atom, a neutron. Instead, they split the atom in two, thus accomplishing fission. Their discovery was widely published to add to the knowledge available concerning nuclear research. But the full significance of their discovery was not immediately understood. It remained for two German refugee scientists working for the Danish scientist, Niels Bohr, properly to evaluate the discovery made by Hahn and Strassman. Bohr was prevailed upon to come to the United States to work with Einstein, who, on August 2, 1939, wrote to the then President of the United States outlining the military potential of the atom. In 1942 Enrico Fermi, an Italian scientist, achieved a chain reaction in Chicago demonstrating that the fissioning of uranium could be made continuous. In 1943 the Manhattan District was created, and in 1945 atom bombs were dropped on Japan. A new and awesome source of power had been discovered.

"Before the dawn of the atomic era man knew 92 elements, the smallest particles of which were believed to be indestructible, immutable and indivisible. With the achievement of fission, however, these smallest particles, called the 'atoms of matter', were found (1) capable of self-destruction and self-transmutation and (2) divisible. Atoms are composed of protons containing a positive charge, neutrons without a charge, and electrons containing a negative charge.

"Hydrogen, having an atomic weight of 1, is the lightest atom (H–1). On the other hand, uranium has an atomic weight of 238 (U–238). The sum of the protons and neutrons making up the atom is its mass number, and the figures given above indicate those sums. The mass number of an atom closely approximates its atomic weight. Until the discovery of plutonium, which is fissionable like U–235, U–238 was considered the heaviest of the 92 known elements. At the present time it is found principally in the Belgian Congo, in Canada, Australia, the United States and in Europe and particularly in Czechoslovakia. We do not know what discoveries may have been made in other territories controlled by the Union of Soviet Socialist Republics. To every 140 parts of U–238 found and separated from the ore, there exists in nature one part of U–235, which differs from U–238 in that it is more easily fissionable. U–235 is an isotope of U–238. The 140 parts of U–238 which are thus separated now are not wasted but are processed at the Hanford, Washington, plant by transmutation from U–238 to plutonium, which has a mass number of 239 and is the first man-made element. Scientists have now found additional elements. The number is now around 100 but as yet these additional elements are regarded principally as scientific curiosities. Thorium (T–232) can be made into U–232 and becomes radioactive. It is thus properly called a 'fertile' rather than a 'fissionable' material, though for the purposes of our study this may be a distinction without a difference. Other minerals may also be found to have this characteristic. In achieving fission an atom of U–235 or plutonium (Pu–239) is bombarded by neutrons. It splits into two parts and neutrons are released. This also releases great energy. The neutrons thus released strike other atoms and the process continues. This is the so-called 'chain-reaction'. The scientists have found that it is possible to stop the chain reaction or restrain it by inserting in the reactor, bars which absorb the neutrons faster than the atom. The amount of energy produced by the conversion of matter is fantastic. For example, we are informed that if one pound of matter could be entirely converted, the energy produced would be equal to that given off by burning 1½ million tons of coal.

"The above refers to fission. Fusion, unlike fission, joins the lighter materials. Elements fuse to make a new atom. In

the process the atom loses weight which releases energy. The process of fusion is still so classified a secret that the layman knows little about it. The hydrogen bomb is an illustration of fusion."