**AMOCO PRODUCTION COMPANY, a corporation, Champlin Petroleum Company, a corporation, Union Pacific Land Resources Corporation, a corporation, Plaintiffs,**

v.

**GUILD TRUST, Melba L. Guild, Delmar D. Dean and Mary Melba Guild Dean, husband and wife, Earl Guild and Barbara Jo Guild, husband and wife, Ferd Christiansen and Eva Lois Christiansen, husband and wife, Defendants.**

**No. C77–215K.**

United States District Court, D. Wyoming.

Nov. 29, 1978.

Frank H. Houck and Harry O. Hickman, Amoco Production Co., Denver, Colo., and Houston G. Williams of Wehrli & Williams, Casper, Wyo., for plaintiff Amoco Production Co.

D. Thomas Kidd, Houston G. Williams of Wehrli & Williams, Casper, Wyo., for plain-

tiffs Champlin Petroleum Co. and Union Pacific Land Resources Corp.

Charles D. Phillips, Evanston, Wyo., and John D. Troughton, Kemmerer, Wyo., for defendants.

## MEMORANDUM OPINION

KERR, District Judge.

Plaintiffs are seeking injunctive relief and a determination of the mineral title of a certain section of land located in Uinta County, Wyoming. The land in question is part of the "checkerboard" land grants of the U.S. government to the Union Pacific Railroad in the mid 1800's. The essential question to be resolved is the ownership of the oil, gas and associated liquid and gaseous hydrocarbons in and under Section 7, Township 14N, Range 117 West of the 6th P. M.

From the year 1850 to 1880, Congress granted to states, territories, and railroad companies upward to one hundred and fifty million acres of public domain in aid of the construction of railroads. With the passage of the Pacific Railway Acts of 1862 and 1864 (12 Stat. 489, 13 Stat. 356), these land grants were made directly to the railroad companies.

The act of July 1, 1862 granted to the "Pacific railroad companies" rights of way over the public lands. The extent of these rights of way were 200 feet in width on each side of the center line of the railroad and all necessary grounds for buildings. In addition, the act granted every alternate section of public land not sold or reserved, designated by odd numbers, to the extent of ten miles on each side of the road. The amendatory act of July 2, 1864 enlarged this grant to the extent of twenty miles on each side of the road.[1]

The lands were given to the railroad companies to raise funds to construct the railroad and to give them the necessary right of way. The railroad companies used the land as collateral for loans or would sell the land directly.

In this particular case, the United States issued a patent to UPRR dated October 31, 1909. The railroad then conveyed the surface of Section 7 to the devisees under the last will and testament of C. L. Byrne in July of 1901. The deed reserved to the Union Pacific "[a]ll coal and other minerals within or underlying said lands" and associated rights of entry and surface use.[2]

This reserved mineral estate was conveyed by Union Pacific Railroad Company to plaintiff, Union Pacific Land Resources Corporation. The latter corporation then executed a mineral deed of the oil and gas rights to Champlin Petroleum Company. Champlin then granted an oil and gas lease to Amoco. Defendants Guild Trust are the successors in interest under the Bryne will and therefore the owners of the surface estate.

Prior to the commencement of drilling on Section 7, Amoco sought the consent of Guild Trust to the proposed drilling. Amoco offered the usual royalty interest in any minerals recovered. The Guild Trust refused the offer and would not allow Amoco

---

1. Lindley, Curtis H., *A Treatise on the American Law Relating to Mines and Mineral Lands* § 151 (1914).

2. The reservation in the Deed reads:

"Excepting and reserving to said Pacific Railroad Company, its successors and assigns, First: A strip of land two (200) hundred feet wide on each side of the center line of the railroad of said Union Pacific Railroad Company as said road is now constructed over and across said land.

Second: All coal and other minerals within or underlying said lands.

Third: The exclusive right to prospect in and upon said land for coal and other minerals therein, and to mine for and remove, from said land, all coal and other minerals which may be found thereon by any one.

Fourth: The right of ingress, egress, and regress upon said land to prospect for, mine and remove any and all such coal or other minerals, and the right to use so much of said land as may be convenient or necessary for the right of way to and from such prospect places or mines, and for the convenient and proper operation of such prospect places, mines and for roads and approaches thereto or for removal therefrom of coal, mineral, machinery or other material."

access to the land. Guild Trust contended that the deed was ineffective to reserve the oil and gas rights.

Both the plaintiffs and the defendants seek to quiet title in themselves. The plaintiffs also seek injunctive relief to ban the defendants from interfering with mineral exploration.

This case revolves around an interpretation of a deed, in particular the meaning of the reservation clause "all coal and other minerals." The intent of the parties to the deed must be determined.

Kirgis in his article, "Mineral Reservations by Railroads and Local Government Bodies", Second Annual Rocky Mountain Mineral Law Institute, p. 1, 3 (1956), states that:

"The basic legal principle in this subject area is that the intention of the parties controls in the interpretation of an instrument and, if the intention of the parties can be ascertained from the instrument itself, arbitrary rules of law as to construction will not be involved. The intention of the parties will be derived from the 'four corners' of the instrument and parol evidence is admissible to prove intention only where the instrument is ambiguous on its face and where, in any given jurisdiction, the interpretation of the language of the instrument is not subject to a fixed 'rule of law'."

Although the Supreme Court of Wyoming has not ruled on this type of reservation, many state and federal courts have. The great weight of authority establishes that this language unambiguously includes oil and gas and is effective to sever the entire mineral estate.

Professor Hemingway in "The Law of Oil and Gas" § 1.1 (1971) states the proposition:

"In perhaps a majority of states, a conveyance or reservation of the 'minerals' will include oil, gas and petroleum products, unless a contrary intent is manifested on the face of the instrument." See also, 1A Summers, The Law of Oil and Gas § 135 (1954):

"It is a general rule adhered to by a majority of the courts, that a conveyance or exception of minerals includes oil and gas, unless from the language of the instrument, or from the facts and circumstances surrounding the parties at the time of the execution, it is found that the term was used in a more restricted sense."

Besides this favored approach to mineral reservations, courts have used two other approaches.[3]

The first approach is commonly referred to as the "Pennsylvania rule" since it stems from the case, *Dunham v. Kirkpatrick*, 101 Pa. 36, 47 Am.Rep. 696 (1882). This rule states that the term "mineral" does not include oil and gas unless other language in the instrument indicates an intent to include these specific resources. Thus, it employs a unique presumption that minerals not expressly named in a reservation are not reserved. Through long usage it has become a rule of property in Pennsylvania.

The second approach stems from an Arkansas case, *Missouri Pacific Railroad v. Strohacker*, 202 Ark. 645, 152 S.W.2d 557 (1941). This rule states that a grant or reservation of minerals is ambiguous as to whether oil and gas are included, therefore extrinsic evidence of the use of the term at the particular time and place of the conveyance is required. Courts of that state have tested the content of a reservation including "minerals" by the general legal and commercial usage of the term.

Although the Arkansas approach was not used by the court in reaching its determination, extrinsic evidence was presented. Petroleum historians and geologists presented fascinating information on early petroleum discoveries in Wyoming. It was clearly established that petroleum, oil and gas were thought of as minerals in Wyoming as early as the 1870's. Evidence was presented from popular, general circulation journals and newspapers as well as scientific and governmental publications. There is no

---

3. 1 H. Williams and C. Meyers, *Oil and Gas Law* § 219 (1977) R. Hemingway, *Oil and Gas Law* § 1.1 (1971).

doubt that even under the limited Arkansas approach that the term "mineral" includes oil and gas.

Although a few jurisdictions outside these states have cited the above rules, they are considered by most scholars to be limited in application to the states of their birth.[4] For the most part, these two approaches have not been followed in the West. See, *Western Development Co. v. Nell*, 4 Utah 2d, 112, 288 P.2d 452 (1955) and *New Mexico and Arizona Land Co. v. Elkins*, 137 F.Supp. 767 (D.C.N.M.1956).

One important reason for this is the pervasive influence in the West of the federal public land laws. Pruitt makes clear in his article, "Minerals Terms—Some Problems In Their Use and Definition", Eleventh Annual Rocky Mountain Mineral Law Institute 1, 12 (1966), that the federal laws referring to "minerals" have:

"[f]rom an early date . . . been very broadly interpreted to include virtually every known substance found in the earth which has sufficient value to warrant the cost of its extraction. It is not surprising, therefore, that the Western states . . . have adopted broad, all-inclusive interpretations of the term "minerals" in contrast to the sometimes narrow interpretations adopted in the midwestern and eastern states."

While the courts in Wyoming have not been called upon to determine whether a reservation or grant of "minerals" includes oil and gas, Wyoming law has always considered oil and gas to be minerals and to be part of the mineral estate. Territorial statutes enacted in 1888 grouped petroleum with other minerals.[5] The State's Constitution also classified oil with other minerals, Section 3 of Article 15 provided for the taxation of mines and mining claims, including those for oil.[6]

An 1895 Wyoming Supreme Court decision reviewed a criminal conviction under Section 10 of the 1888 territorial statute, the culprit having destroyed a building on an oil placer mining claim site. *Van Horn v. State*, 5 Wyo. 501, 40 P. 964 (1895). In upholding the conviction, the court repeatedly referred to the oil location as a "mining claim" and treated the land for purposes of the statute as "mineral land".

Other Wyoming state court decisions also support the rule that a reservation of "all coal and other minerals" includes oil and gas. In *State ex rel. School District No. 1 v. Snyder*, 29 Wyo. 163, 212 P. 758 (1923), the court approved the following language from *Swayne v. Lone Acre Oil Co.*, 98 Tex. 597, 86 S.W. 740:

"Oil before its extraction is a mineral and is a part of the land, and in so far as the question under discussion is concerned it is to be considered like iron, coal, lead, or other mineral substances." 212 P. at 765.

In a well reasoned article dealing with this question, Prof. Kuntz supports a rule of law for Wyoming in accord with the majority approach.[7] He reasons that both the probable intent of the parties and the development of Wyoming's petroleum resources are best served by a rule of law interpreting a grant or reservation that includes "minerals" as affecting a severance of the entire mineral estate, including oil and gas.

The article perceptively points out that the rules developed in Pennsylvania and Arkansas have gone astray by trying to find a specific intent to include a particular substance as a mineral. On the contrary, it was obvious to Prof. Kuntz that these instruments were reflecting a general intent. This general intent was:

---

4. Kirgis, supra at 9.

5. Sess.Laws 1888, ch. 40, § 1 authorized the formation of mining districts "[i]n any mining district or in [any] mining field of discovery of veins, leads, lodes or ledges, or of gold placers, petroleum fields, soluble salt deposits, or of any mineral lands whatever, . . . ."

6. Then, as now, that section read as follows: "All mines and mining claims from which gold, silver, and other precious metals, soda, saline, coal, mineral oil or other valuable deposit, is or may be produced shall be taxed . . . ."

7. Kuntz, *The Law Relating to Oil and Gas in Wyoming*, 3 Wyo.L.J. 107 (1949).

". . . to sever from the surface all substances presently valuable in themselves, apart from the soil, whether their presence is known or not, and all substances which became valuable through development of the arts and sciences." (p. 113). See also, *Northern Natural Gas v. Grounds*, 441 F.2d 704, 714 (10th Cir. 1971), cert. denied, 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971).

The policy considerations in favor of this interpretation are considerable. An established rule of law provides a reliable means of ascertaining mineral ownership. This certainty is important because of the heavy investment of capital required to develop petroleum and other mineral resources. Without an established rule of law, the courts would necessarily be called upon to interpret numerous reservations. This is evident from the series of cases that result in states following Arkansas authority. With every new technology that develops a use for a particular gas or hard rock mineral, resort is made to the courts. Conservation of judicial resources is another valuable advantage of the Kuntz rule.

The authorities cited above and the references to case law contained in those works are persuasive. Two federal cases can be singled out as controlling this decision.

The first is an U. S. Supreme Court decision written by Justice Van DeVanter, formerly of the Wyoming Supreme Court, *Burke v. Southern Pacific Railroad Co.*, 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527 (1913). This decision squarely holds that petroleum is a mineral. This case was certified up to the Supreme Court to answer seven questions that arose out of land grants to Southern Pacific Railroad with reservations to the United States government.

The important question for the purposes of this present case is the fifth: "Is petroleum or mineral oil within the meaning of the term 'mineral' as it was used in said acts of Congress reserving mineral land from the railroad land grants?", p. 676, 34 S.Ct. p. 910. After discussing case law and scientific opinions on the nature of petroleum, the court concluded:

"The statute . . . was dealing with a practical subject in a practical way, and we think it used the words 'mineral land,' and intended they should be applied, in their ordinary and popular sense. In that sense . . . they embrace lands chiefly valuable for petroleum. Our answer to the fifth question must therefore be in the affirmative." p. 679, 34 S.Ct. p. 911.

The second case is a Tenth Circuit decision, *Skeen v. Lynch*, 48 F.2d 1044 (10 Cir. 1931). This controversy involved a patent issued under the Stock Raising Homestead Act of 1916 which reserved "all coal and other minerals" to the United States. This language is identical to the language used in the Deed in this present case.

The Tenth Circuit held that this reservation was effective to reserve petroleum to the United States as part of a severed mineral estate. The Court said there was:

"No room to doubt that it was the purpose of Congress in the use of the phrase 'all coal and other minerals' to segregate the two estates, the surface for stockraising and agricultural purposes from the mineral estate, and to grant the former to entrymen and to reserve all of the latter to the United States." p. 1046.

It is clear from all of the above authorities that the reservation of "all coal and other minerals" is unambiguous and severs the mineral estate from the surface, including the oil, gas and associated liquid and gaseous hydrocarbons and reserves the mineral estate to the grantor.

Plaintiffs are therefore entitled to judgment giving them title to the entire mineral estate, including oil, gas and associated liquid and gaseous hydrocarbons, in and underlying Section 7 (except the NE ¼ and 25.17 acres of abandoned railroad right-of-way). Further, plaintiffs are entitled to a permanent injunction against any interference by the defendants in the reasonable enjoyment of their rights in the mineral estate.

Judgment will be entered in accordance with the Memorandum Opinion.