Gertrude Griffith McDONALD, the Personal Representative of the Estate of Joseph B. Barlow, also known as J. B. Barlow, Deceased, Plaintiff and Appellant,

v.

ANTELOPE LAND AND CATTLE COMPANY, a corporation; Samuel M. Pedrick, also known as S. M. Pedrick, A. L. Mauslin, also known as A. L. Maudlin, unknown stockholders and unknown creditors of the Antelope Land and Cattle Company, a corporation; and all other persons unknown claiming any estate or interest in, or lien or encumbrance upon, the property described in the Complaint, Defendants,

Louis Schmidt and Mary P. Schmidt; Peter F. Rech and Elsie Rech; Howard Luhman and Vernon Luhman; Albert J. Baar and Alice Baar; Matt J. Dassinger and Hilda Dassinger; George A. Koffler and Anna R. Koffler; Wm. Dassinger and Kathryne Dassinger; Dorothy Kolling; Ralph Zent and Mina Zent; Nick Biel; Wallace Messmer and Kathleen Messmer; Donald Muth; Frank P. Lech and Elizabeth B. Lech; Joe M. Kech and Eleanor Kech; Julia Dassinger; Edward Thielen and Dorothy Thielen; Peter C. Weisman and Charlene Weisman; Margaret T. Anton; Joe Klemm and Kathryn Klemm, Intervenors and Appellees,

Josephine Muth and Peter Muth, Intervenors and Appellees.

Civ. No. 9715.

Supreme Court of North Dakota.

June 20, 1980.

Rehearing Denied July 17, 1980.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for plaintiff and appellant; argued by James D. Geyer, Dickinson.

Freed, Dynes, Malloy & Reichert, Dickinson, for first set of intervenors; argued by George T. Dynes, Dickinson.

Greenwood, Greenwood & Greenwood, Dickinson, for second set of intervenors; no appearance.

SAND, Justice.

Gertrude Griffith McDonald, the personal representative of the estate of J. B. Barlow, appealed from the judgment of the Stark County district court which declared null and void the mineral reservations in the deed issued by the Antelope Land and Cattle Co. and quieted title to the real estate in question, including oil, gas, coal, clay, uranium, and all other minerals, in the various intervenors.

The property involved in this lawsuit was originally conveyed to the Northern Pacific Railroad in a land grant authorized in 1864 by the Thirty-eighth Congress of the United States in return for the construction of a railroad from Lake Superior to the Puget Sound. Shortly after the turn of this century, the railroad or its companion corporation, Northwestern Improvement Company, sold the land in question to the Antelope Land and Cattle Co. [ALC], a Wisconsin corporation. The conveyances issued to ALC contained no mineral exceptions or reservations.

Between 1906 and 1925 ALC conveyed the approximately eleven sections of Stark County land involved in this lawsuit to the intervenors or their predecessors in interest using 37 separate conveyances, each of which contained the following reservation and exception in favor of ALC:

"Reserving and excepting from the same, coal and mineral rights in such lands as are now known or shall hereafter be ascertained to contain coal or iron and also the use of such surface ground as may be necessary for mining operations and the right of access to such reserved and excepted coal and iron lands for the purpose of exploring, developing and working the same, said exceptions and reservations to be for the use and benefit of the party of the first part, its successors and assigns."

In 1939 ALC became insolvent and the corporation was dissolved. In its resolution of dissolution ALC gave J.B. Barlow, the president and major stockholder of the corporation, a "warranty deed to all of the lands of the company" in return for Barlow's assumption of ALC's debts. However, the warranty deed inadvertently omitted and failed to convey the interest contained in the above-quoted mineral reservation, which therefore remained in the name of ALC.

On 4 May 1977 the estate of J.B. Barlow commenced this action against ALC and its former officers, directors, and stockholders to quiet title in the estate to all the minerals which were reserved by the 37 conveyances. The present surface owners were not named as defendants in the lawsuit because there was no issue concerning ownership of the surface. Nevertheless, two sets of intervenors who are the present title holders of portions of the land claimed by the estate were permitted by the district court to intervene in the case.

On 24 April 1979 the J.B. Barlow estate moved the district court for a default judgment against ALC and for summary judgment against both sets of intervenors.

A hearing was held on these motions, after which the district court granted the motion for default judgment against ALC holding that the warranty deed obtained by J.B. Barlow from ALC included that interest described in the reservation set out earlier herein even though it was not specifically referred to in the deed. In substance, the court reformed the deed to comply with the existing circumstances and intention at the time of the conveyance. This resulted in giving J.B. Barlow whatever minerals were reserved in the approximately eleven sections of Stark County land involved in this case, together with the use of the surface ground as may be necessary for mining operations and access. The default judgment, however, did not resolve the meaning of the language in the reservation. This issue was part of the action in which the summary judgment was sought. The district court denied the summary judgment motion against the intervenors leaving as an issue for trial only the meaning and effect of the ALC mineral reservation.

At the trial, the intervenors submitted abstracts of title which covered the property involved in this case. The intervenors also presented three witnesses who testified that they had no personal knowledge of any coal or iron under the land that they owned. The estate rebutted the testimony of these witnesses by presenting three government documents which indicated the presence of coal under the land in question. All this evidence was admitted by the trial court over objection.

At the conclusion of the trial, the Stark County district court determined that the mineral reservation contained in the numerous deeds from ALC to the intervenors or their predecessors in interest was "ineffective and void because of its own provisions." The court fund that the reservation was clear and unambiguous on its face and that it was never intended to reserve any interest in minerals other than coal and iron.

The court concluded that because no coal or iron was known to exist anywhere in, on, or under the property involved in this litigation at the time of the various conveyances from ALC and because no coal or iron had at any time in the more than fifty years thereafter been ascertained to exist in, on, or under any of the property, the reservation was indefinite and therefore ineffective and void. The district court then quieted title in the intervenors to all the surface, and all oil, gas, coal, clay, uranium, and all other minerals in the various tracts of land, and ruled that the estate of J.B. Barlow had no interest or estate in any of the property, or any part thereof, including oil, gas, coal, clay, uranium and all other minerals.

The J.B. Barlow estate appealed the district court ruling. The default judgment was not appealed. The question before us on appeal is whether or not the court below correctly interpreted the mineral reservation contained in the deeds from ALC to the intervenors or their predecessors in interest. This issue involves a question of law and is therefore fully reviewable by this court.

We note initially that although the North Dakota legislature has recently enacted two statutes which directly address the interpretation and construction of mineral leases and mineral reservations in deeds, grants, or conveyances of real property, the reservations in the instant case were made long before the statutes became effective and the statutes are, therefore, not controlling here. See, § 47–10–24, NDCC; § 47–10–25, NDCC.

■ Section 47–09–11, NDCC, provides that grants of real property are to be interpreted in like manner with contracts in general. Therefore, in order to accurately determine the meaning of the reservation language in the deeds from ALC, we refer to Ch. 9–07, NDCC, the statutory guidelines of contract interpretation in North Dakota.

■ Section 9–07–02, NDCC, provides that the language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurd-

ity. The district court in this case determined that the reservation in the ALC deed was clear and unambiguous on its face and was an attempt to reserve only coal and iron. We agree with the trial court that the reservation applied only to coal and iron but we disagree that the reservation language is clear and unambiguous. The language in the ALC deeds reserved and excepted "coal and mineral rights in such lands as are now known or shall hereafter be ascertained to contain coal or iron." The language is subject to more than one construction. A literal interpretation would reserve to the grantor all rights to coal and all rights to all other minerals, but only if the lands then contained or were thereafter ascertained to contain coal or iron. To think that ALC intended to reserve, for instance, oil by the use of the language "mineral rights," but that it only intended to reserve that oil if it was found in land which then contained or was thereafter ascertained to contain coal or iron defies logic and borders on absurdity. A second possible interpretation of the language in the deeds is that the grantor reserved and excepted only rights to coal and iron, but not other minerals. This interpretation appears to be more reasonable because the reservation was made expressly applicable only to lands which contained or were thereafter ascertained to contain coal or iron. The second interpretation is identical with the construction the trial court gave the reservation, although that court, unlike this Court on appeal, found the language "clear and unambiguous."

Because we conclude that the language in the reservation in the ALC deeds is ambiguous, we must interpret the language so as to give effect to the mutual intention of the parties as it existed at the time of contracting so far as that intention is ascertainable and lawful. *Mitchell v. Nicholson*, 71 N.D. 521, 3 N.W.2d 83 (1942); § 9–07–03, NDCC. The best evidence of the parties' intention, of course, is the language in the deed itself, and, therefore, the language of the writing alone, if clear and explicit, governs the interpretation of the parties' intent. *Royse v. Easter Seal Society for Crippled Children,* 256 N.W.2d 542 (N.D. 1977); § 9–07–04, NDCC. Here, however, the language in the ALC deed was not clear and explicit and we must look elsewhere to ascertain the reasonable intention of the parties. See, *Gift v. Ehrichs,* 284 N.W.2d 435 (N.D. 1979).

In *Lalim v. Williams County,* 105 N.W.2d 339 (N.D. 1960), an action to quiet title to certain lands which were acquired by the county to permit the widening of an existing highway, we stated in Syllabus 7 that in interpreting a deed to further the intention of the parties, "the court may consider the subject matter, the object to be obtained, and the circumstances and conditions existing at the time the deed was executed." Thus, evidence as to the meaning of an ambiguous contract, including reference to the circumstances under which it was made and the matter to which it relates, is admissible. *Alm Construction Co. v. Vertin,* 118 N.W.2d 737 (N.D. 1962); § 9–07–12, NDCC.

The trial court in the case at bar had before it the abstracts of title which covered the property in question and copies of each of the deeds by which ALC conveyed the parcels of land. Although each of the deeds recited the reservation language at issue and most of the title abstracts referred to it, this evidence alone provided no appreciable assistance in ascertaining the parties' intent because the deeds contained only the actual wording of the reservation, which we have already determined to be unclear, and the abstracts of title were mere summaries of the deeds' contents by the abstracter. No evidence was presented which plainly established either a fixed subjective meaning of the particular language used by the parties to these conveyances, or that the language used in the instant reservation was customary or standard for that time and place and had a definitive meaning.

 The J.B. Barlow estate asserted in its brief that circumstances existing at the time the deeds in this case were drawn showed that ALC intended to reserve to itself all minerals in the property conveyed. In support of its argument, the estate

pointed out that when the United States Congress initially authorized the land grant by which the Northern Pacific Railroad first obtained the property involved in this lawsuit, it excluded mineral land from the grant, and therefore did not convey to the railroad, any "mineral" public land. The word "mineral," however, specifically did not include coal or iron. The only minerals received by the railroad, then, were coal and iron because if there were any other minerals known in the land, that land was not conveyed by the grant. If any minerals other than coal and iron were thereafter ascertained in the granted land, the land would "revert" back to the government. This, the estate maintained, was the reason why the "coal and minerals rights" and "coal and iron lands" language in the reservation in the deeds from ALC to the intervenors was used. In *Burke v. Southern Pacific Railway Co.*, 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527 (1914), the United States Supreme Court remedied the problem of nonmineral land granted to the railroads "reverting" back to the government when minerals were subsequently ascertained. The court stated that a patent issued to a railroad company which excluded mineral lands, but which was issued without any investigation as to the mineral content of the land conveyed, operated to convey full title to the land even though minerals were thereafter ascertained.

The estate argued that the significance of this history was that because ALC in its deeds to the intervenors intended to reserve all the minerals it could under the Northern Pacific land grant, namely coal and iron, had it known of the future outcome of *Burke* which passed full title to the lands to the railroad and thus to ALC, it would have included in the reservation all of the minerals under the land and not only coal and iron, and that therefore all mineral rights were intended to be reserved to ALC and are now vested in the J.B. Barlow estate. We reject this theory for two reasons. First, if ALC had wanted to reserve all the minerals it could easily have so stated in its reservation. Instead, ALC chose the language "coal and mineral rights in such

lands as are now known or shall hereafter be ascertained to contain coal or iron." Also, and more persuasive, ALC contained to use the reservation language in question here on numerous occasions after the *Burke* decision in 1914. Following *Burke*, ALC knew, or should have known, exactly what rights it had obtained from the railroad and if it unquestionably then wished to reserve to itself all minerals in the land rather than only the coal and iron, ALC would certainly have stopped using the same reservation language it used when it thought only coal and iron were its to reserve.

Our research disclosed no prior judicial interpretation of the precise language used in the reservation in this case, but the Kentucky Court of Appeals construed similar language in *Gibson v. Sellars*, 252 S.W.2d 911 (Ky. 1952). *Gibson* was an action to quiet title to the oil and gas beneath a parcel of land, and the deed there in question reserved "coal and mineral rights" underlying the property. The *Gibson* court restated its established rule that the term "minerals" included oil and gas and therefore held that the "coal and mineral rights" reservation included oil and gas. The estate in the instant case urged that it follows from *Gibson* that the reservation here, "coal and mineral rights in such lands as are now known or shall hereafter be ascertained to contain coal or iron," also included oil and gas. We disagree.

We have stated that the word "mineral" is not a definite term susceptible to a rigid definition applicable in all instances, but rather a term susceptible of limitation or extension according to the intention with which it is used. *Adams County v. Smith*, 74 N.D. 621, 23 N.W.2d 873 (1946). Common sense dictates that the true meaning of a term is determined from the context in which it is used. The deed in *Gibson* reserved to the grantor coal and mineral rights under the entire tract of land which was conveyed. That reservation therefore was without restriction or limitation as to what property was covered by the reservation, and the Kentucky court was accurate in determining that a reservation of miner-

al rights in the entire tract of land included oil and gas. In this case the reservation of coal and mineral rights specifically applied only to lands which "are now known or shall hereafter be ascertained to contain coal or iron." The ALC reservation was thus limited to coal and iron lands and can be succinctly paraphrased as a reservation of "coal and mineral rights in coal and iron lands." If this limitation was absent, our interpretation would likely parallel the *Gibson* decision. However, the subject of coal and iron was referred to here for a definite purpose, and we think the purpose was to restrict the ALC reservation to the coal and iron in the land involved. We therefore interpret the reservation to be one of coal and iron only and that because no evidence was presented which indicated an intention only to reserve "significant deposits" of coal and iron, the deed reserved to ALC all the coal and iron which was known to exist in the property at the time of the conveyance or was thereafter ascertained.

We must now determine the significance of the reservation language "now known or shall hereafter be ascertained." The trial court concluded that there was no coal or iron known to exist anywhere in, on, or under the properties involved in this litigation at the time of the various conveyances by ALC and that no coal or iron had in the more than fifty years thereafter been ascertained to exist in, on, or under any of the property. These findings were deduced from testimonial evidence given by three intervenor witnesses to the effect that they had no personal knowledge of any coal or iron under the land that they owned. The trial court then ruled that the reservation was indefinite and therefore "ineffective and void because of its own provisions."

The intervenors argued on appeal that the trial court was correct in invalidating the reservation of coal and iron because those substances had not been ascertained to exist in the land in question within a reasonable time.

A grant of mineral rights is not a guarantee that the minerals exist. In many instances the grant is speculative until an actual discovery in the vicinity is made. It could be argued that the phrase "as are now known or shall hereafter be ascertained" is mere legalese for "if any exists" which is generally implied in the sale or reservation of mineral rights.

■ In North Dakota, after a mineral title is severed by reservation, the surface and minerals are held by separate and distinct titles, and each is a freehold estate of inheritance. Therefore, when a deed contains a provision excepting and reserving minerals from a grant of title to surface land, two estates are created, one for minerals and one for surface, and each may be conveyed separately thereafter. *Northern Pacific Railway Co. v. Advance Realty Co.*, 78 N.W.2d 705 (N.D. 1956); *Bilby v. Wire*, 77 N.W.2d 882 (N.D. 1956); *Northwestern Improvement Co. v. Morton County*, 78 N.D. 29, 47 N.W.2d 543 (1951). At the very moment of the conveyance from ALC to the intervenors here or their predecessors in interest, the reservation was created and the coal and iron rights were separated from the surface rights.

■ The only problem remaining is whether or not the coal or iron must have been known, or was supposed to have been on or under the property in question at the time the deeds were executed in order for the reservation to be effective at that time. This exact question was encountered and answered in the negative by the United States District Court in *New Mexico and Arizona Land Co. v. Elkins*, 137 F.Supp. 767 (D.N.M. 1956), appeal dismissed without a formal opinion 239 F.2d 645 (10th Cir. 1956). The *Elkins* court stated that

". . . the majority rule, the best reasoned rule and the modern rule is to the effect that in a grant or reservation of mineral rights, it is immaterial whether, at the time of the conveyances, the parties thereto knew what materials were or were not present on the land." 137 F.Supp. at 771.

Further, in *Carlson v. Minnesota Land and Colonization Co.*, 113 Minn. 361, 129 N.W. 768 (1911), the Supreme Court of Min-

nesota interpreted a deed which reserved and excepted from a grant "land such as are now known, or shall hereafter be ascertained, to contain coal or iron." Although the pivotal issue in *Carlson* was whether or not the actual surface lands were reserved or only the coal and iron ore in the lands, the court, in determining that the surface lands had passed to the grantee, treated the "now known or shall hereafter be ascertained" language in the deed as creating a valid reservation of coal and iron ore.

Therefore, we reverse the ruling of the district court insofar as it voided the ALC coal and iron reservation and conclude that the J.B. Barlow estate, the successor to ALC, retains the rights to all coal and iron in the property involved in this lawsuit. The case is remanded for the purpose of entering judgment in accordance with this opinion.

ERICKSTAD, C. J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.